STATE EX REL. ALTON RAILROAD COMPANY, Appellant, v. PUBLIC SERV-ICE COMMISSION.—68 S. W. (2d) 691.

Division Two, February 23, 1934.

*Charles M. Miller* for appellant.

*D. D. McDonald,* General Counsel, for Public Service Commission.

834

COOLEY, C.—This is an appeal by relator, Alton Railroad Company, from the judgment of the Circuit Court of Cole County affirming an order of the Public Service Commission which authorized the State Highway Commission to construct an underpass highway crossing at the point where U. S. Highway No. 54 will cross relator's railroad near Mexico in Audrain County. The point of crossing is about 1500 feet east of the city limits of Mexico. At that place the railroad runs approximately northeast and the highway in an easterly or southeasterly direction from Mexico. The railroad spans a creek called Beaver Dam Creek. When the railroad was built and until 1921 a public highway, now constituting generally a part of said Highway 54, passed under the railroad adjacent to the east bank of Beaver Dam Creek. The underpass was then only wide enough for one traffic lane. Going southeastward the highway, as then and now located at that point, approaches the railroad at a somewhat acute angle and close to the railroad curves sharply to the right, passes under the tracks and then curves sharply to the left and in a little distance again curves to the right so that, approaching the underpass from either direction there is a sharp curve near the underpass. The section of highway, about 300 feet in length, comprising the underpass and the curves on each side thereof, is called in the record a ''goose-neck curve,'' a sufficiently descriptive term.

In 1921 the County Court of Audrain County and the Mexico special road district desired to improve the highway. Those authorities and the then state highway authorities had in mind relocating that section of the highway on approximately the line now

proposed for permanent Highway No. 54, eliminating the goose-neck curve. The railroad company opposed such relocation. After some negotiations it was agreed by the county court and road district and the railroad company to widen the old underpass so as to provide for two traffic lanes with a wooden pier between them supporting the railroad bridge. That was done at an expense of $6917, $500 of which was paid by the county and $6417 by the railroad company. The highway was then or soon thereafter surfaced with gravel, the goose-neck curve situation remaining substantially as above described. The Highway Commission now seeks to locate the permanent crossing of Highway No. 54 and the railroad at a point about sixty feet east of the east side of the present underpass. Strictly speaking the direction is more nearly northeast but as it is called east in the record we shall so designate it. This would result in abandonment of the present underpass and would eliminate the goose-neck curve and afford ample visibility of the highway beyond the underpass to a traveler approaching from either side. At present such visibility is very poor. The evidence indicates that a traveler approaching from either direction cannot see the highway on the opposite side of the railroad until he is practically in the underpass. A grade crossing at the point proposed would be dangerous. The proposed underpass is feasible.

Highway 54 is a cross-state highway and one of the important primary roads of the state highway system. It is to be of concrete and is expected to carry a heavy volume of traffic. Mr. E. J. Hollow, assistant division engineer of the State Highway Department, estimated that when it is all surfaced with concrete as planned the traffic will average 1500 to 2000 vehicles per day. He based his estimate partly on the fact that "it is United States Route 54, which is nationally advertised as a short route from Chicago to Kansas City, and it will be an all-concrete route across the State and connect with one of the bridges across the Mississippi River to the east."

The evidence tends to show and the Public Service Commission found that the present subway is sufficiently safe on the existing gravel surfaced highway, "if cars slow down to a speed of approximately twenty miles per hour before negotiating the turn." But it further tends to show that with the higher speed and the volume and character of traffic that must inevitably be expected on a concreted state highway such as No. 54 is to be the present subway with the curves on each side and the limited visibility will not be safe. The presence of the bridge pier between the two traffic lanes as now located adds to the hazard. The commission found that unless travelers on the highway materially reduce their speed on approaching the subway they are in danger of colliding with portions of the bridge supporting structure and that even if the subway should remain as now located it would be necessary to reconstruct it "to accommodate the traffic that will travel on Route U. S. No. 54, upon its comple-

tion." But even if reconstructed so as to remove that central·pier the sharp curves would remain and the vision would be restricted. The commission concluded that "in the interest of public safety . . . the subway should be constructed at the proposed point of crossing;" a conclusion we think justified by the facts in evidence.

The railroad company, at the request of the Public Service Commission and without waiving its contentions, had prepared and submitted at the hearing plans for the proposed new underpass and the bridge over same which are satisfactory to all parties interested. The estimated cost of the improvement is $20,800. That, we understand, does not include the grading and surfacing of the highway through and adjacent to the proposed new underpass, which is to be done by the Highway Commission at its expense. The Public Service Commission by its order authorized the Highway Commission to cross the railroad with Highway No. 54 at the proposed point and by the proposed underpass and apportioned the cost thereof one-half to the Highway Commission and one-half to the railroad company, the latter to maintain the structure. The circuit court affirmed the order.

I. Appellant contends first that the Public Service Commission's jurisdiction in matters of this kind is limited by statute to the elimination of existing grade crossings and that it was without jurisdiction to authorize the underpass in question and that in any event the apportionment of cost to the railroad company "must be limited to the benefit the railroad would receive from the elimination of an existing grade crossing."

(a) Appellant's contention as to the commission's jurisdiction cannot be sustained. The statute, Section 5171, Revised Statutes 1929 (9 Mo. Stat. Ann., p. 6585), gives the commission exclusive power to determine and prescribe the manner, including the particular point of crossing, and the terms of installation, operation, maintenance, apportionment of expenses, etc., of *(inter alia)* "each crossing of a public road or highway by a railroad . . . or *vice versa,*" and to alter or abolish any such crossing and, where in its judgment practicable, to require a separation of grades at any such crossing *heretofore or hereafter* established, upon terms and an apportionment of expense to be prescribed by the commission. The statute was construed by this court en banc with reference to a contention similar to that here made by appellant and such contention was held untenable in State ex rel. M., K. & T. Ry. Co. v. Public Service Commission, and State ex rel. Wabash Ry. Co. v. Public Service Commission, 271 Mo. 270, 197 S. W. 56. In that case the city of Moberly applied to the commission for an order requiring the railway companies to widen and otherwise improve a then existing subway under the railroad tracks which had originally been constructed many years previously pursuant to contract between the city and the Wabash

Railway Company and which had become inadequate for the increased street traffic. The railway companies insisted there, as does appellant here, that the power of the commission in the matter of regulation of crossings is limited to grade crossings. The court analyzed the statute, quoted with approval definitions of the term "crossing" from other jurisdictions, and held that by Section 5171, supra, the commission is given power to regulate and provide for the alteration and maintenance of "*all*" such crossings whether they be by subway, on grade, or overhead. The word 'crossing' as used in the act is sufficient in scope to include all such crossings and we are of the opinion that the Legislature so intended." [271 Mo. 1. c. 284.] We think that construction of the statute is clearly correct and, further, that the commission, in the instant case, had jurisdiction whether the proposed underpass be considered a new crossing or underpass or the alteration of a preexisting one.

Appellant seeks to distinguish State ex rel. v. Pub. Serv. Comm., supra, on the ground that there were in that case elements of unsafety in the then existing subway which are not present in the instant case, such as "insufficient vertical clearance, lack of abutments to prevent earth and water from the embankments falling in the sidewalk and roadway, and failure to provide floors in the bridges that will prevent oil, cinders or dirt from falling upon travelers;" that the case "did not involve the reconstruction of a subway, by moving it about sixty feet to the east, as in the case at bar." But it did involve the complete reconstruction and a substantial widening of the old subway to accommodate the increased traffic demands. The latter was one of the most important factors, if not the most important factor, in the case. The objections to the existing subway, above quoted, such as insufficient vertical clearance, etc., could doubtless have been met without widening the subway. While some conditions existed in that case that are not present in this and *vice versa*, they are differences in details rather than differences calling for the application of different governing rules. So far as concerns the question of the commission's jurisdiction there is no difference in principle between that case and the one at bar.

■ It is also argued that the proposed change of location of the underpass and the re-alignment of the highway are not reasonably necessary for purposes of safety but that the change is desired "solely for the purpose of higher speed on the highway" and in order that motor vehicles may not be required to slacken speed in going through the underpass. The argument misconceives the underlying reason of the Highway Commission for requesting and of the Public Service Commission in authorizing the proposed underpass. It is not primarily to make possible a higher speed but rather because of the fact that upon a highway of the type of the one designed a much larger volume of traffic and much higher speed *must inevitably be*

*expected* in any event than would be the case on an ordinary graveled road such as No. 54 has been; because of which increased traffic and higher speed the present underpass, with its adjacent sharp curves and poor visibility would endanger the traveling public, especially persons not familiar with it. The premises considered, we cannot say that the commission's order authorizing construction of the proposed subway at the point designated is unreasonable or arbitrary.

■ (b) Neither can we allow appellant's further contention that the apportionment of cost to the railroad company "must be limited to the benefit the railroad would receive from the elimination of an existing grade crossing." The statute seems clearly to settle that contention adversely to appellant. Section 5171, supra, authorizes the commission to prescribe the proportion in which the expense shall be divided between the railroad or street railway corporations affected "or between such corporations and the State, county, municipality or other public authority in interest; *provided, however,* that in all cases of the state highways, not more than one-half of the cost of construction of any grade separation, overhead or underpass, authorized or ordered by the commission shall be apportioned to the state highway commission." Highway No. 54 is a state highway. There are but two parties to this controversy, two parties interested, viz., the railroad company and the State Highway Commission. Since no more than half of the cost can be apportioned to the latter the other half must be apportioned to the railroad company.

■ It is argued that the proposed improvement is merely the reconstruction of the present underpass and that the last above-quoted provision of the statute does not apply to such reconstruction. We need not determine whether or not said provision of the statute would apply to work constituting merely the reconstruction of an existing subway. In this case permanent Highway No. 54 as proposed to be established will cross the railroad at a point different from the present crossing. The Highway Commission petitioned for authority to construct a subway at that point as a grade crossing there would be dangerous and the Public Service Commission granted such authority. Though close to the old crossing it is nevertheless a new crossing. While the old underpass will probably remain open, because it will be cheaper to support the railroad tracks on piers than to fill up the space with earth, the present underpass will be abandoned for highway purposes upon completion of the new one. It will not be within permanent Highway 54 nor constitute any part thereof. Suppose the proposed new crossing were a mile or a half or a quarter of a mile distant from the present crossing, could it be said that the proposed new subway is merely a reconstruction of the old one? We think not and we cannot see that there is any difference in principle because the distance is only sixty feet.

II. Appellant insists that if the commission had authority to assess to the railroad company any part of the cost of the proposed subway it should have given said company credit against such assessment at least for its expenditure in 1921 in constructing the present subway. On this point, in stating its conclusions, the commission said:

"In considering the division of the cost of the proposed structure, the Commission is confronted with the question, Shall the expenditure made in 1921 be considered as part of the cost of the permanent structure and shall the company be credited with the amount it expended at that time? It is evident that the existing structure serves a necessary railway purpose of drainage. So far as it serves also as an underpass, it was built as a temporary structure, at the railway company's request and not in conformity with the Highway Commission's permanent plans. It has remained in use, at a saving to the company, for a sufficient time to render it equitable that the company now bear one-half of the expense of the permanent crossing. The Commission will therefore divide the cost of the proposed subway equally between the appellant and defendant."

The *order* of the commission directs that the Highway Commission and the railroad company shall each bear fifty per cent of the cost of construction of the proposed subway.

We find in the record no evidence that "the existing structure serves a necessary railway purpose of drainage," unless the "existing structure" referred to is meant to include the railroad bridge over Beaver Dam Creek of which the structure over the underpass is an extension. If it was so meant and may be so interpreted the statement is clearly correct. The other facts found are supported by the evidence. The present structure over the subway is of wood. The chief engineer of the railroad company testified: "We consider wooden bridges temporary bridges." This will be replaced with permanent steel construction in building the new subway, the cost of such substitution being included in the cost of the new subway, one-half thereof to be paid by the Highway Commission. But for the presence of the railroad the subway would be unnecessary. In view of all the circumstances we do not feel justified in setting aside the commission's apportionment of cost as inequitable and unreasonable. And in this connection another fact must be kept in mind. As pointed out above the proposed subway is not merely an enlargement or reconstruction of the present one. While the present subway seems to have been regarded rather as a temporary than as a permanent structure, the contract pursuant to which it was constructed made no provision for future extension or change of location or construction. So far as that contract affects the situation the matter was ended when the 1921 work was done. Any subsequent change was dependent upon voluntary action or agreement of the parties

interested or else had to be accomplished by proceedings such as in the instant case. In this situation we think the 1921 expenditure could not reasonably be considered a part of the cost of the proposed subway nor that the work then done and that now proposed can be treated as parts of a single project. And unless the work and expenditure of 1921 and that now proposed be considered as in substance and effect one improvement, part of which was done in 1921 and the remainder to be done under the present order of the commission, which we think cannot be done, we are unable to see how the railroad company can be given credit for its 1921 expenditure against its apportioned half of the cost of the proposed subway without violating the statute. The effect of giving such credit would, of course, be to make the Highway Commission pay more than half and the railroad company less than half of the cost of the proposed subway. This point is ruled against appellant.

■ III. Appellant contends that the commission should not have authorized the construction of the proposed subway at this time because of the distressed financial condition of appellant; that it is not reasonably able, financially, to contribute to the cost; for which reasons the proposed work should be postponed until industrial and financial conditions shall have improved and appellant is reasonably able to pay its share of the cost out of earnings.

The evidence on this point was that of appellant's chief engineer who testified in substance that appellant's operating revenues have greatly decreased since 1929; that it has made extensive retrenchments in operating and maintenance expenditures, and that in 1931, in October of which year the hearing was held, it had been able only to pay operating expenses and interest on its bonded debt, leaving nothing for stockholders. Appellant cites Lake Shore Electric Ry. Co. v. Public Utilities Commission (Ohio), 180 N. E. 552, decided in 1932, as authority for its contention that the commission acted unreasonably and unlawfully in not refusing on that ground to authorize the construction of the proposed subway at this time.

In the Ohio case permission had been granted by the Utilities Commission to separate a grade crossing and to construct a viaduct over the railroad. The estimated total cost of the proposed structure and the amount to be paid by the railway company were both much larger and the railway company's financial condition was worse than in the case before us. In the Ohio case it was practically conceded that it would be impossible for the railway company to get funds to make the proposed improvement at that time. The Ohio statute authorized an improvement of the kind there in question to be ordered upon a finding that it was reasonably necessary and expedient. The Utilities Commission made such finding. The Supreme Court's decision reversing the commission's order was based upon the use of

the word "expedient" in the statute. It quoted Funk & Wagnall's definition of "expedient" as: "Serving to promote a desired end or interest; suitable under the circumstances; . . . proper or desirable; advisable," and said: "In deciding whether the improvement is suitable, proper, desirable or advisable, we are necessarily compelled to consider the financial condition of the railroads in question at the present time." After discussing such condition the court held:

"Until the condition of the Lake Shore Electric Railway changes for the better, it is not suitable, desirable, advantageous or proper to compel it to enter into so large an expenditure. That is, the building of the improvement is not at this time expedient."

We do not find in our statute the requirement that the commission must find a proposed improvement to be expedient as well as reasonably necessary in order to be authorized to direct it to be made. The orders of the commission must be reasonable. By Section 5247, Revised Statutes 1929 (9 Mo. Stat. Ann., p. 6673), it is provided that the burden of proof shall be upon the party seeking to set aside any determination, requirement, direction or order of the commission to show "by clear and satisfactory evidence" that the determination, requirement, direction or order complained of is unreasonable or unlawful. Applying this statutory mandate, see State ex rel. Wabash Ry. Co. v. Pub. Serv. Comm., 306 Mo. 149, 267 S. W. 102; State ex rel. Mo. Pac. Railroad Co. v. Pub. Serv. Comm. (Mo.), 297 S. W. 47. To hold on the facts of this case that the commission's order is unreasonable, therefore unlawful, would result in the continuance of a situation menacing the safety of the public and would tend to hinder and delay the completion of the state highway system and the correction of similar dangerous conditions thereon. The cost apportioned to the railroad company in this case is not an exhorbitant sum and it is not shown that said company cannot procure the necessary funds. We appreciate the financial difficulties with which the railroads are laboring. But considering all the facts and circumstances of the case we do not feel justified in holding that the order of the commission is unreasonable or unlawful. It is our conclusion that the judgment of the circuit court affirming the order of the Public Service Commission should be and it is affirmed. *Westhues* and *Fitzsimmons, CC.,* concur.

PER CURIAM:—The foregoing opinion by Cooley, C., is adopted as the opinion of the court. All the judges concur.