## NASHVILLE, CHATTANOOGA & ST. LOUIS RAILWAY *v.* WALTERS, COMMISSIONER OF HIGHWAYS, ET AL.

No. 183.   Argued December 6, 1934.—Reargued January 16, 1935.—Decided March 4, 1935.

406

*Mr. Fitzgerald Hall* for appellant.

408

*Mr. Edwin F. Hunt,* Assistant Attorney General of Tennessee, with whom *Mr. Roy H. Beeler,* Attorney General, was on the brief, for appellees.

Mr. Justice Brandeis delivered the opinion of the Court.

This suit under the Uniform Declaratory Judgment Act of Tennessee,[1] was brought, on November 21, 1931, in the Chancery Court of Davidson County, Part One, by the Nashville, Chattanooga & St. Louis Railway against the State Highway Commissioner and the Attorney General. The purpose of the suit is to secure a determination of the constitutionality of an order entered by the Commission and, as so applied, of Chapter 132 of the Tennessee Acts of 1921, upon which the order rests.[2] The statute authorizes the Commission whenever a state highway crosses a railroad to require the separation of grades if in its discretion " the elimination of any such grade crossing is necessary for the protection of persons travelling on any such highway or any such railroad "; and, without conferring upon the Commission any discretion as to the proportion of the cost to be borne by the railroad, requires the latter to pay in every case, one-half of the total cost of the separation of grades. The order requires the Railway to construct an underpass so as to separate grades where a proposed state highway will cross its main line within the limits of the little town of Lexington; and to bear one-half the cost thereof.

---

[1] Public Acts of Tennessee, 1923, c. 29.

[2] Public Acts of Tennessee, 1921, c. 132, entitled "An Act to provide for the elimination of grade crossings on State Highways"; amended 1923, c. 35; 1925, c. 88.

The Railway does not question the power of the State
to build the proposed highway; nor its power to require
the separation of grades; nor the appropriateness of the
plan adopted for such separation; nor the reasonableness
of the cost—$17,400.  It does not deny that if the pro-
posed highway is built, safety of travel thereon and on
the railroad will be promoted by separation of grades.  It
concedes that in Tennessee, as elsewhere, the rule has long
been settled that, ordinarily, the State may, under its po-
lice power, impose upon a railroad the whole cost of elim-
inating a grade crossing, or such part thereof, as it deems
appropriate.[3]  The claim of unconstitutionality rests
wholly upon the special facts here shown.  The main con-
tention is that to impose upon the Railway, under these
circumstances, one-half of the cost is action so arbitrary
and unreasonable as to deprive it of property without due
process of law in violation of the Fourteenth Amendment.

The bill of complaint sets forth in detail the facts relied
upon as showing that the action was arbitrary and unrea-
sonable.  The answer justifies the imposition solely as an
exercise of the police power.  Because many of the alle-

---

[3] See *Dyer County* v. *Railroad,* 87 Tenn. 712; 11 S. W. 943; *Harri-
man* v. *Southern Ry. Co.,* 111 Tenn. 538; 82 S. W. 213; *Chattanooga*
v. *Southern Railway,* 128 Tenn. 399; 161 S. W. 1000; *Nashville, C. &
St. L. Ry.* v. *Drainage District,* 149 Tenn. 490; 261 S. W. 975.  Exer-
tion of the power was sustained by this Court in the following cases:
*New York & New England R. R.* v. *Bristol,* 151 U. S. 556; *Cincin-
nati, I. & W. Ry.* v. *Connersville,* 218 U. S. 336; *Chicago, M. & St. P.
Ry.* v. *Minneapolis,* 232 U. S. 430; *Missouri Pacific Ry.* v. *Omaha,*
235 U. S. 121; *Erie R. R.* v. *Public Utility Commissioners,* 254 U. S.
394; *Lehigh Valley R. R.* v. *Commissioners,* 278 U. S. 24.  Compare
*Chicago, B. & Q. Ry.* v. *Drainage Commissioners,* 200 U. S. 561;
*Lake Shore & Michigan Southern Ry.* v. *Clough,* 242 U. S. 375; *Mis-
souri, K. & T. Ry. Co.* v. *Oklahoma,* 271 U. S. 303; *Missouri ex rel.
Wabash Railway* v. *Public Service Comm'n,* 273 U. S. 126; *Nashville,
C. & St. L. Ry.* v. *White,* 278 U. S. 456; *New Orleans Public Service*
v. *New Orleans,* 281 U. S. 682.

gations of the bill were denied, much evidence was introduced. That contained in the printed record in this Court occupies, with exhibits, 492 pages. The trial court found that, with one exception,[4] the evidence fully supported every averment of fact in the bill. It held that the order and the statute as applied, in so far as they require the Railway to pay one-half the cost of the underpass, are arbitrary and unreasonable; and that they are void. The decree enjoined the Commissioner from attempting to enforce payment by the Railway; ordered that the entire cost of the project (except for contributions by the Federal Government) be borne by the State Highway Commission; and directed the defendants to pay the costs of the cause. Upon appeal, the Supreme Court of the State reversed that decree; ordered the bill dismissed; and allowed an appeal to this Court. 167 Tenn. 470; 71 S. W. (2d) 678. Consideration of the jurisdiction thereof was ordered postponed to the hearing on the merits.

The Supreme Court declined to consider the special facts relied upon as showing that the order, and the statute as applied, were arbitrary and unreasonable; and did not pass upon the question whether the evidence sustained those findings. It held that the statute was, upon its face, constitutional; that when it was passed the State had, in the exercise of its police power, authority to impose upon railroads one-half of the cost of eliminating existing or future grade crossings; and that the Court could not " any more " consider " whether the provisions of the act in question have been rendered burdensome or unreasonable by changed economic and transportation conditions," than it

---

[4] It was alleged in the bill that the construction of the underpass was unnecessary. The decree recites: " The court finds from the evidence that there are no facts to sustain this averment and that in the interest of commerce by motor vehicle on the public highways, this was a proper engineering project, properly conceived, located, designed and constructed."

" could consider changed mental attitudes to determine
the constitutionality and enforceability of a statute." A
rule to the contrary is settled by the decisions of this
Court. A statute valid as to one set of facts may be invalid
as to another.[5] A statute valid when enacted may become
invalid by change in the conditions to which it is applied.[6]
The police power is subject to the constitutional limita-
tion that it may not be exerted arbitrarily or unreason-
ably.[7] To this limitation, attention was specifically called
in cases which have applied most broadly the power to
impose upon railroads the cost of separation of grades.
*Cincinnati, I. & W. Ry.* v. *Connersville,* 218 U. S. 336, 344;
*Chicago, M. & St. P. Ry.* v. *Minneapolis,* 232 U. S. 430,
441; *Missouri Pacific Ry.* v. *Omaha,* 235 U. S. 121, 127;
*Erie R. Co.* v. *Public Utility Commissioners,* 254 U. S.
394, 409, 410; *Lehigh Valley R. Co.* v. *Commissioners,* 278
U. S. 24, 34, 35. Compare *Denver & Rio Grande R. Co.*
v. *Denver,* 250 U. S. 241, 244; *Southern Ry.* v. *Virginia,*
290 U. S. 190, 196.

*First.* Unless the evidence and the special facts relied
upon were of such a nature that they could not conceiv-
ably establish that the action of the State in imposing

---

[5] *Kansas City Southern Ry.* v. *Anderson,* 233 U. S. 325; *Poindexter*
v. *Greenhow,* 114 U. S. 270, 295. Compare *Dahnke-Walker Co.* v.
*Bondurant,* 257 U. S. 282, 289; *Withnell* v. *Ruecking Construction Co.,*
249 U. S. 63, 71; *Chicago, T. H. & S. E. Ry.* v. *Anderson,* 242 U. S.
283.

[6] *Abie State Bank* v. *Bryan,* 282 U. S. 765, 772; *Chastleton Corp.*
v. *Sinclair,* 264 U. S. 543, 547; *Perrin* v. *United States,* 232 U. S. 478,
487. Compare *Missouri Pacific R. Co.* v. *Norwood,* 283 U. S. 249.

[7] *Washington ex rel. Seattle Trust Co.* v. *Roberge,* 278 U. S. 116;
*Nectow* v. *Cambridge,* 277 U. S. 183; *Delaware, L. & W. R. R.* v.
*Morristown,* 276 U. S. 182; *Pennsylvania Coal Co.* v. *Mahon,* 260
U. S. 393; *Eubank* v. *Richmond,* 226 U. S. 137; *Dobbins* v. *Los An-
geles,* 195 U. S. 223; *Lake Shore & M. S. Ry.* v. *Smith,* 173 U. S. 684;
see too, *McLean* v. *Arkansas,* 211 U. S. 539, 547; *Lawton* v. *Steele,*
152 U. S. 133, 137–8.

upon the Railway one-half of the cost of the underpass was arbitrary and unreasonable, the Supreme Court obviously erred in refusing to consider them. The charge of arbitrariness is based primarily upon the revolutionary changes incident to transportation wrought in recent years by the widespread introduction of motor vehicles; the assumption by the Federal Government of the functions of road builder; the resulting depletion of rail revenues; the change in the character, the construction and the use of highways; the change in the occasion for elimination of grade crossings, in the purpose of such elimination, and in the chief beneficiaries thereof; and the change in the relative responsibility of the railroads and vehicles moving on the highways as elements of danger and causes of accidents. The facts specifically found, or of which the courts could take judicial notice, are these:

1. The decree of the trial court recites, as a finding upon the evidence, " that this underpass is a part of a state-wide and nation-wide plan to foster commerce by motor vehicle on the public highways, the result of which is to afford competition with railroads and that the decision to build this underpass, its location and construction, was not in any proper sense an exercise of the police power, but rather, as set forth in the bill of complaint, pursuant to a general plan of internal improvement fostered by the Congress of the United States in conjunction with the several States to make a nation-wide system of super-highways in the interest of interstate commerce by motor vehicle, much of which is in active competition with the railroads themselves "; " that in the interest of commerce by motor vehicles on the public highways, this was a proper engineering project, properly conceived, located, designed and constructed "; but " that this underpass did not involve an exercise of the police power any more than many other features of this project, such as elimination of curves, grades, widening the pavement et cetera."

2. The State highways of Tennessee (as distinguished from county and city roads and turnpikes) have their origin in the Federal-aid highway legislation.[8] The aim of that legislation is " a connected system of roads for the whole Nation "; " to provide complete and economical highway transport throughout the Nation "; to furnish " a new means of transportation, no less important to the country as a whole than that offered by the railroads "; [9] to establish " lines of motor traffic in interstate commerce." [10] The immediate interest of the Federal Government is, in part, the national defense as well as the transportation of the mails.[11] The relief of the unemployment incident to the business depression has been the main incentive for highway construction since April 4, 1930—the period in which the highway here in question was undertaken and completed.[12]

To achieve its purposes, the Federal Government has made large contributions to the cost of the Federal-aid highway system. In each year, it has made to each State

---

[8] It was largely in anticipation of Federal-aid legislation that the State Highway Commission of Tennessee was created in 1915. Report of the Commissioner, Tenn. Dep't of Highways and Public Works (1926), p. 14; Public Acts of Tennessee, 1915, c. 100, §§ 8, 9.

[9] Report of Chief of (Federal) Bureau of Public Roads for the year ending June 30, 1922, pp. 1, 5. See also Report for year ending June 30, 1923, p. 3.

[10] First Message of President Harding to Congress, April 12, 1921.

[11] See Conference Report on " Bill to provide that . . . the Secretary of Agriculture on behalf of the United States, shall in certain cases, aid the States in the construction, improvement, and maintenance of roads which may be used in the transportation of interstate commerce, military supplies or postal matter." June 16, 1916, Sen. Doc. No. 474, 64th Cong., 1st Sess. See too, H. Rep. No. 26, 64th Cong., 1st Sess. (1916) p. 4; Sen. Rep. No. 134, 67th Cong., 1st Sess. (1921), p. 1. Compare. Co-ordination of Motor Transportation, 182 I. C. C. 263, 366 (1932).

[12] Reports of Chief of Bureau of Public Roads (1931) pp. 2–7; (1932) pp. 1–3; (1933) pp. 1–4; (1934) pp. 1–5.

grants in money, proportioned according to various factors, to be expended in defraying up to one-half the cost of constructing therein the designated highways.[13] In addition, it has, through the War Department, allotted to the several States their pro rata shares of surplus war equipment and supplies valued at more than $224,000,-000.[14] It has at all times given to the several States the benefit of its economic and physical research; and other aid by its experts and administrators.[15] It has, since the depression, given to the several States emergency grants to be expended in highway construction for the relief of

[13] Act of July 11, 1916, c. 241, §§ 3, 6, 39 Stat. 355; Act of Feb. 28, 1919, c. 69, § 6, 40 Stat. 1200; Act of Nov. 9, 1921, c. 119, §§ 11, 20, 42 Stat. 212; Act of June 19, 1922, c. 227, § 4, 42 Stat. 660; Act of Feb. 12, 1925, c. 219, § 1, 43 Stat. 889; Act of June 22, 1926, c. 648, § 1, 44 Stat. 760; Act of May 26, 1928, c. 755, § 1, 45 Stat. 750; Act of April 4, 1930, c. 105, §§ 1, 2, 46 Stat. 141; Act of June 18, 1934, c. 586, § 4, 48 Stat. 993.

[14] See Reports of Chief of Bureau of Public Roads (1920) p. 25; (1922) p. 29; (1923) p. 27; (1927) p. 1.

[15] The research was instituted by the Department of Agriculture, October 3, 1893, and has been pursued continuously since. See Report of the Special Agent and Engineer for Road Inquiry for 1896, p. 145; Reports of the Director of Office of Road Inquiries from 1897–1904; Reports of Director of Office of Public Roads, 1905–1918; Reports of Chief of Bureau of Public Roads, 1918–1934.

[16] The Act of 1928 appropriated for each of the fiscal years ending June 30, 1930 and 1931, $75,000,000. The Act of 1930 appropriated for each of the fiscal years ending June 30, 1932 and 1933, $125,-000,000. The Act of December 20, 1930, c. 19, 46 Stat. 1030, in order " to provide for emergency construction . . . with a view to increasing employment," appropriated $80,000,000, " as a temporary advance of funds to meet the provisions of (the Federal Highway) act as to State funds required on Federal-aid projects." By the Emergency Relief and Construction Act of July 21, 1932, c. 520, Title III, § 301 (a); 47 Stat. 709, 716, a similar " temporary advance " of $120,000,000, was made " for the purpose of providing emergency construction . . . with a view to increasing employment and carry-

unemployment.[16]   In the fiscal years ending June 30,
1931, 1932 and 1933, during which this highway was au-
thorized and completed, Tennessee received from the Fed-
eral Government, for the highway system, in cash, $11,-
063,325; [17] and at the close of that period practically the
entire expense of building Federal-aid roads in the State
was being borne by the Federal Government.[18]

The Secretary of Agriculture, acting through the Fed-
eral Bureau of Public Roads, has determined in large
measure, not only the location of the Federal-aid high-
ways in the several States, but also their character and

---

ing out the policy declared in the Employment Stabilization Act of
1931." By the National Industrial Recovery Act of June 16, 1933, c.
90, Title II, § 204 (a), 48 Stat. 195, " the President is authorized to
make grants to the highway departments of the several states in an
amount not less than $400,000,000, to be expended by such depart-
ments in accordance with the provisions of the Federal Highway
Act." By the Act of June 18, 1934, c. 586, 48 Stat. 993, " for the
purpose of increasing employment by providing for the emergency
construction of public highways," there was appropriated the further
sum of $200,000,000, to be similarly expended. Section 14 of the same
Act provides: " No deductions shall hereafter be made on account of
prior advances and/or loans to the States for the construction of
roads under the requirements of the Federal Aid Highway Act or
on account of amounts paid under the provisions of Title I of the
Emergency Relief and Construction Act of 1932 for furnishing relief
and work relief to needy and distressed people."

[17] See Reports of Chief of Bureau of Public Roads, (1931) pp. 34,
55; (1932) pp. 2, 29; (1933) pp. 2, 31.

[18] Estimated cost of Federal-aid roads under construction in Ten-
nessee on June 30, 1933, totalled $4,645,392, of which $2,321,975 was
to be defrayed with Federal-aid money, and $2,166,751 with Federal
Emergency Construction funds. *Id.* (1933) p. 14, Table 15. See too,
Report of State Highway Commissioner of Tennessee for biennium
ending June 30, 1934, p. 206–7, Table No. 29, showing disbursements
on Federal-aid projects, July 1, 1932 to June 30, 1933, totalling $5,-
473,229, and receipts from United States Government on those proj-
ects of $4,018,219.

420

their incidents. Early legislation provided that: " The Secretary of Agriculture and the State highway department of each State shall agree upon the roads to be constructed therein and the character and method of construction." [19]   The Act of 1921 required each State to select and submit to the Secretary, for approval as the object of future Federal-aid expenditures, " a system of highways not to exceed 7 per centum of the total mileage of such state "; the system was to " be divided into two classes, one of which shall be known as primary or interstate highways, and the other which shall connect or correlate therewith and be known as secondary or intercounty highways." [20]   Congress transferred to the Secretary the powers and duties in relation to highways and highway transport originally conferred upon the Council of National Defense.[21]   The War Plans Division of the General Staff and Corps of Engineers of the War Department promptly coöperated with the Bureau of Public Roads " in a study the purpose of which is the selection of those highways which are important from a military standpoint." [22]

Upon the Secretary devolves the duty of prescribing needful rules and regulations, including such recommendations as he might deem necessary for " insuring the safety of traffic on the highways." [23]   Both the Federal-aid legis-

---

[19] Act of July 11, 1916, c. 241, § 1, 39 Stat. 355.

[20] Act of November 9, 1921, c. 119, § 6, 42 Stat. 212. On June 30, 1934, the total mileage of the designated Federal-aid highway system in Tennessee was 3,982, of which 1,925.1 had been improved with Federal aid. Report of Chief of Bureau of Public Roads, September 1, 1934, p. 18. The mileage of the official state highway system, including the Federal-aid system is 7,247.3. Report of State Highway Commissioner of Tennessee, January 5, 1935, p. 102, Table No. 1.

[21] Act of November 9, 1921, c. 119, § 3, 42 Stat. 212.

[22] Report of Chief of Bureau of Public Roads, October 15, 1920, p. 7.

[23] Act of November 9, 1921, c. 119, § 18, 42 Stat. 212.

lation and the regulations adopted thereunder encourage the elimination of grade crossings.[24]  The general principles adopted by the Bureau of Roads to be applied where possible treat " all intersections of a railway and highway at grade " as " a condition dangerous to traffic on the highway—which should not exist in a well designed and completed system "; treat topographic conditions as having only an " incidental bearing "; and refuse to treat " unobstructed view of the railway track from the highway " as constituting a safe crossing.[25]  The Federal Government may pay one-half of the total cost of an underpass, even if the State is relieved by contributions of the railroad or others from paying the other half.[26]

3. Federal-aid highways are designed so that motor vehicles may move thereon at a speed commonly much greater than that of railroad trains.[27]  The main purpose of grade separation therefore is now the furtherance of

---

[24] By the Act of June 19, 1922, c. 227, § 4, par. 3, 42 Stat. 660, " railroad grade separations, whether by means of overhead or underpass crossings," are classed with " bridges," and are thus excepted from the limitations placed upon amount of federal aid which may be expended upon each mile of roadway.  Act of July 11, 1916, c. 241, § 6, 39 Stat. 355; Act of February 28, 1919, c. 69, § 5; 40 Stat. 1200; Act of April 4, 1930, c. 105, § 3; 46 Stat. 141.  Section 8 of Regulation 6, of Rules and Regulations for Carrying Out the Federal Highway Act (approved July 22, 1922) provides: " Grade crossings occurring in the Federal-aid highway system shall be classified for priority of improvement by agreement between the state highway departments and the Bureau of Public Roads."  See too, Report of Chief of Bureau of Public Roads (1924), p. 7.

[25] General Memorandum of the Bureau of Public Roads, No. 13, July 5, 1922.

[26] Compare Act of June 19, 1922, c. 227, § 4, par. 3, 42 Stat. 660; Opinion of Solicitor of Bureau of Public Roads, July 24, 1922.

[27] In Tennessee, prior to 1925, the maximum permissive speed on public highways was 20 miles an hour.  Public Acts of Tennessee, 1905, c. 173.  By Act of 1925, c. 132, the maximum was increased to 30 miles.  By Act of 1931, c. 82, all restrictions on speed were

uninterrupted, rapid movement by motor vehicles. In this respect grade separation is a desirable engineering feature comparable to removal of grades and curves, to widening the highway, to strengthening and draining it, to shortening distance, to setting up guard rails, and to bridging streams.[28] The railroad has ceased to be the prime instrument of danger and the main cause of accidents.[29]

---

eliminated. The speed of motor vehicles is now often more than 75 miles. Compare Note (1933) 46 Harv. L. Rev. 838.

Prior to 1931, vehicles approaching railroad grade crossings were ordinarily required to come to a full stop at some point not less than 10 nor more than 50 feet from the railroad tracks. Public Acts of Tennessee, 1917, c. 36. By Act of 1931, c. 82, vehicles are not required to slow up or stop on approaching railroad grade crossings unless there is a positive signal of the immediate approach of a train or cut of cars, or when the State Highway Department designates a particular crossing as dangerous. Neither the existing or the proposed crossing at Lexington has been so designated. Compare *Baltimore & Ohio R. Co.* v. *Goodman*, 275 U. S. 66; *Pokora* v. *Wabash Ry. Co.*, 292 U. S. 98.

[28] Compare Report of Chief of Bureau of Public Roads (1929) p. 10: "On all roads and especially the important routes included in the Federal-aid system, solution of the problems raised by the increased traffic is not provided merely by building of higher types of surfaces. A general widening of the surfaces is also required, and in view of the greater speeds now customary and legally permissible, the easing and superelevation of curves, the cutting away of banks which obscure vision, and other improvements in detail which contribute to safety. The elimination of dangerous grade crossings is an expensive but urgently required improvement and on densely travelled roads it is already desirable to separate the grades of intersecting highways." See, too, Fisher, Connecticut's Regulation of Grade Crossing Elimination, Journal of Land & Public Utility Economics (1931) 367, 385.

[29] Accidents caused by motor vehicles running into trains amounted in 1928 to 22% of the total of grade crossing accidents; in 1929 to 24%; in 1930 to 26.5%; in 1931, to 28.6%; in 1932, to 30.6%; and in 1933, to 31.3%. Interstate Commerce Commission Accident Bulletins, Nos. 97–102, Table 78. Of the fatalities in automobile accidents in the United States during 1934, 3.3% resulted from collision with

It is the railroad which now requires protection from dangers incident to motor transportation. Prior to the establishment of the Federal-aid system, Tennessee highways were built under the direction of the county courts, and paid for out of funds raised locally by taxation or otherwise.[30] They served, in the main, local traffic. The long distance traffic was served almost wholly by the railroads and the water lines. Under those conditions the occasion for separation of grades was mainly the danger incident to rail operations; and the promotion of safety was then the main purpose of grade separation. Then, it was reasonable to impose upon the railroad a large part of the cost of eliminating grade crossings; and the imposition was rarely a hardship. For the need for eliminating existing crossings, and the need of new highways free from grade crossings, arose usually from the growth of the community in which the grade separation was made; this growth was mainly the result of the transportation facilities offered through the railroad; the separation of grade crossings was a normal incident of the growth of rail operations; and as the highways were then feeders of rail traffic, the community's growth and every improvement of highway facilities benefited the railroad. The effect upon the railroad of constructing Federal-aid highways, like that here in question, is entirely different. They are not feeders of rail traffic. They deplete the existing rail traffic and the revenues of the railroads. Separation of grades serves to intensify the motor competition and to further deplete rail traffic. The avoidance thereby made possible

railroad trains; of the persons injured, only one-half of 1% (.5%) were injured in such collisions. See pamphlet entitled " Thou Shalt Not Kill," p. 5, issued by The Travelers Insurance Co., February, 1935.

[30] Report of the Commissioner, Tenn. Dept. of Highways and Public Works (1926) p. 13. In 1915 there were 19,668 automobiles in Tennessee; in 1930, 368,259.

of traffic interruptions incident to crossing at grade is now of far greater importance to the highway users than it is to the railroad crossed. For the rail operations are few; those of motor vehicles very numerous.

4. Lexington is a rural community of 1,823 inhabitants located in a sparsely settled territory. The construction of the new highway with the underpass was not designated to meet local transportation needs. It was undertaken to serve as a link in a nation-wide system of highways.[31] State Highway No. 20, as formerly routed, passed through Lexington on Clifton Street, and crossed the railroad at grade; it was adequate for the existing traffic and that to be expected. The traffic on that highway was, and is, small. The grade crossing has presented no serious interruption to traffic. The trains are infrequent. Only six trains are operated now each way in every twenty-four hours; five of these moving between 10 P. M. and 6 A. M., when there is substantially no highway travel.[32] The grade crossing on the old route is protected by the most modern electrical device. That the crossing is not dangerous is attested by the fact that during the ten years following January 1, 1921, there were but two minor accidents; and these were settled for $50. That the present facilities are deemed locally both safe and adequate is attested by the fact that neither the city authorities, nor any one else, has suggested elimination of this grade crossing; that the grade crossing is to remain

[31] The old Highway No. 20, from Perryville, on the Tennessee River, to Lexington, is a winding gravel road which passes through several towns and crosses the Railway eight times at grade. The new route is a comparatively straight, paved road, crossing the river a short distance above Perryville, avoiding some of the towns served by the old road, and crossing the Railway only at the Lexington underpass.

[32] At the beginning of the suit, the Railway was operating seven trains every twenty-four hours.

unchanged after the new highway is put into use; and that the Clifton Street route will continue to be used for the local traffic.[33]

5. The underpass required is for a new and additional highway over which State Highway No. 20 is being re-routed, which will be a part of a Federal-aid route between Nashville and Memphis, the best route between those two cities; and which will connect at these termini with highways extending into other States. This highway was planned by the State Highway Department, acting in conjunction with the Bureau of Public Roads of the Federal Government. It is part of the secondary or inter-county system; but because of the expected traffic, the district engineer of the Bureau of Roads, in recommending its approval, characterized it as a route of primary importance. The underpass was prescribed, not upon consideration of local safety needs, but in conformity to general plans of the federal and state highway engineers, as being a proper engineering feature in the construction of a nation-wide system of highways for high speed motor vehicle transportation; and because it is the policy of the federal authorities to make the avoidance of grade crossings a condition of a grant in aid of construction. The requirement of the underpass, and the payment by the Railway under the 1921 Tennessee Act of one-half the cost of separating the grades, are results of the Federal-aid legislation. Final payment of Federal aid on this project was conditioned upon commencement of the construction of this underpass.

---

[33] On February 16, 1933, while this suit was still in progress in the trial court, the new Route No. 20, between Perryville and Lexington, was opened to traffic, although a part of the Highway No. 100, connecting Route 20 with Nashville, was not yet paved. A witness for the railroad testified that traffic counts, taken on May 2 and 3, 1933, at the old Clifton Street crossing and at the new underpass, which is on the outskirts of the town, indicated that the underpass was then diverting only 20% of the traffic from the grade crossing.

6. The new highway, paralleling lines of the Railway and intended for rapid-moving motor vehicles, will, through competition for both freight and passenger traffic, seriously decrease rail traffic and deplete the Railway's revenue and net earnings. Practically all vehicles moving upon it will directly or indirectly compete for traffic with the Railway.[34] Buses will operate over the new highway in regular scheduled movements in the same way as passenger trains. Trucks, some of them 70 feet in length and many weighing with load as much as 50,000 pounds, operated by common carriers, by contract carriers and by private concerns, will compete for the most profitable classes of freight. The competition besides reducing the volume of traffic will compel reduction of rates.

How disastrously such competition will affect the Railway's traffic and revenues is shown by its own experience since the State commenced, with the aid of the Federal Government, a system of highways paralleling the lines of the Railway. The gross passenger revenue fell from $5,661,011.08 in 1920 to $2,095,942.29 in 1930; and to $1,139,238 in the first nine months of 1931. The Railway carried, in 1920, 4,385,630 revenue pasengers; in 1930 only 680,347; and in the first nine months of 1931, only 370,445. The Railway's freight traffic experienced a similar decline. Of the less-than-carload freight, more than two-thirds was diverted from the railroads to motor trucks. In many

---

[34] The report of the District Engineer of the Bureau of Public Roads states: "When the Nashville to Linden connection is completed and the balance of this route to Jackson paved, it is expected that a large percentage of the traffic now using State Route No. 1, between Nashville and Jackson, will be diverted to this route, and it is confidently expected that several thousand vehicles will be using the route in the near future." The Railway introduced in evidence traffic counts on Route 1, showing the weekday foreign traffic amounting to 13% and 23% of the total motor vehicle traffic; and truck and bus traffic amounting to 16% and 19% of the total.

classes of carload traffic similar decreases were experienced by rail carriers. In 1921, the railroads brought into Nashville 5,689 cars of livestock—being 69.79 per cent of the total. In 1930, they brought in only 641 cars, being 21.24 per cent of the total. That the decrease in the Railway's traffic was due mainly to increased motor competition following the construction of the new highways, appears from the fact that the decrease began while general business was active; and that, even in the years of economic depression, the Railway's freight traffic was practically constant in the relatively few regions where its rail lines were not paralleled by hard surfaced highways; and that traffic increased when highways paralleling its lines were temporarily closed for reconstruction. The reduction in traffic and depletion in revenues has been particularly severe during the three years preceding 1933.

7. While the Railway, the sufferer from the construction of the new highway, is burdened with one-half the cost of the underpass, the owners of trucks and buses and others, who are beneficiaries of its construction, are immune from making any direct contribution toward the cost. It is true that one-half of the cost is by law to be borne by the highway fund of Tennessee (except in so far as it may be covered by the Federal aid),[35] and that the truck and bus owners and others contribute as taxpayers to that fund. But, while nearly 28 per cent. of the gross revenues of the Railway is required annually to pay the state and local taxes and the cost of maintaining the roadway acquired and constructed at its own expense, the state commercial motor carriers, which are supplied by the State with the roadway on which they move, pay in

---

[35] The acting chief of the Bureau of Public Roads stated in reply to a letter of the Railway's counsel, that he knew of no reason why the Federal Government would not, upon proper request, pay one-half of the cost of the underpass if it conformed to the Bureau's requirements.

state and local taxes not more than 7 per cent. of their gross revenues.  The taxes laid upon truck and bus owners are clearly insufficient to pay their fair share even of the cost and maintenance of the highways which serve them.  Motor vehicle taxes of all kinds, ad valorem, privilege, license plate, and others, will not pay for one-half of the annual expenditure in Tennessee for highways.  The balance is being paid in part by general property taxes, in part by borrowing and in part by the Federal Government.  Of the ad valorem taxes paid by the Railway to the State and the political divisions thereof, about 20 per cent. is allocated directly to roads, some of which are no longer feeders to its traffic, but serve as highways for the traffic taken by its competitors.  The relative pro rata tax burden laid upon common carriers by motor vehicle is alleged to be one-fourth of that laid upon the railroads.[36]

*Second.*  The Supreme Court of Tennessee erred in refusing to consider whether the facts relied upon by the Railway established as arbitrary and unreasonable the imposition upon it of one-half the cost of the underpass. The promotion of public convenience will not justify requiring of a railroad, any more than of others, the expenditure of money, unless it can be shown that a duty to pro-

---

[36] The principal taxes paid by motor vehicle owners in Tennessee are the registration fees and gasoline taxes, the proceeds of which are used mainly for highway purposes.  See Reports of State Highway Commissioner (1932) pp. 27, 32–3, 241, 285;  (1934) pp. 22, 23, 199, 221.  Besides these, the state levies a mileage tax upon commercial vehicles.  Mileage taxes collected from intrastate operators go into the general state funds;  those collected from interstate operators, into the highway fund.  In 1932, it was testified, this tax yielded a gross revenue of approximately $100,000; and a net revenue of $40,000 for the general fund, and $18,000 for the highway fund.  The ad valorem taxes paid by common carrier motor vehicles are negligible. In 44 of the richest counties, they aggregated in 1928, $1,371.97; in 1929, $1,714.01; in 1930, $1,185.04.

vide the particular convenience rests upon it. *Missouri Pacific Ry.* v. *Nebraska,* 164 U. S. 403; *Missouri Pacific Ry.* v. *Nebraska,* 217 U. S. 196; *Great Northern Ry.* v. *Minnesota,* 238 U. S. 340; *Great Northern Ry.* v. *Cahill,* 253 U. S. 71. These were the authorities relied upon by this Court in *Chicago, St. P., M. & O. Ry.* v. *Holmberg,* 282 U. S. 162, 167, where it held that to require a railroad to provide, at its own expense, an underpass, not primarily as a safety measure but for private convenience, was a denial of due process.

It is true that the police power embraces regulations designed to promote public convenience or the general welfare, and not merely those in the interest of public health, safety and morals. *Chicago, B. & Q. R. Co.* v. *Illinois ex rel. Drainage Commissioners,* 200 U. S. 561, 592. And it was stipulated that " in the light of modern motor vehicular traffic anything which slows up that traffic is an inconvenience. In other words, eliminating a grade crossing, as in the case at bar, facilitates the speed of motor vehicular traffic, in accordance with public demands." But when particular individuals are singled out to bear the cost of advancing the public convenience, that imposition must bear some reasonable relation to the evils to be eradicated or the advantages to be secured. Compare *Hadacheck* v. *Los Angeles,* 239 U. S. 394; *Miller* v. *Schoene,* 276 U. S. 272.[37] While moneys raised by general taxation may constitutionally be applied to purposes from which the in-

---

[37] Early cases establishing the rule that the entire cost of a grade separation may be imposed upon the railroad perhaps reflect the attitude that " the business of railways is specially dangerous," *Thorpe* v. *Rutland & Burlington R. Co.,* 27 Vt. 140, 150; and that " crossing highways and running locomotives, were they not authorized by law, would be nuisances." Mr. Justice Strong, dissenting in *Fertilizing Co.* v. *Hyde Park,* 97 U. S. 659, 679. Compare *Woodruff* v. *Catlin,* 54 Conn. 277, 295; 6 Atl. 849.

dividual taxed may receive no benefit, and indeed, suffer serious detriment; *St. Louis & Southwestern Ry.* v. *Nattin,* 277 U. S. 157, 159; *Memphis & Charleston Ry.* v. *Pace,* 282 U. S. 241, 246; so-called assessments for public improvements laid upon particular property owners are ordinarily constitutional only if based on benefits received by them. *Myles Salt Co.* v. *Iberia Drainage District,* 239 U. S. 478; *Gast Realty Co.* v. *Schneider Granite Co.,* 240 U. S. 55; *Kansas City So. Ry.* v. *Road Imp. Dist. No. 6,* 256 U. S. 658.

It is also true that state action imposing upon a railroad the cost of eliminating a dangerous grade crossing of an existing street may be valid although it appears that the improvement benefits commercial highway users who make no contribution toward its cost. *Chicago, B. & Q. R. Co.* v. *Nebraska,* 170 U. S. 57, 75; *Missouri Pacific Ry.* v. *Omaha,* 235 U. S. 121; that a railroad has no constitutional immunity from having to contribute to the cost of safeguarding a crossing with another railway line, merely because the first railroad was built before the crossing was made; *Detroit, F. W. & B. I. Ry.* v. *Osborn,* 189 U. S. 383; *Northern Pacific Ry.* v. *Puget Sound & Willipa Harbor Ry.,* 250 U. S. 332; [38] and that the State may, under some circumstances, impose upon a railroad the cost of the grade separation for a new highway. But in every case in which this Court has sustained the imposition, the new highway was an incident of the growth or development of the municipality in which it was located. *Northern Pacific Ry.* v. *Duluth,* 208 U. S. 583, 592; *Cincinnati, I. & W. Ry.* v. *Connersville,* 218 U. S. 336; *Chicago, M. & St. P. Ry.* v. *Minne-*

---

[38] By some state courts a different rule has been applied, particularly as to the original cost of the crossing. *Toledo, A. A. & N. M. Ry. Co.* v. *Detroit, L. & N. R. Co.,* 62 Mich. 564, 573; 29 N. W. 500; see *State ex rel. Northern Pacific Ry.* v. *Railroad Comm'n,* 140 Wis. 145, 160–1; 121 N. W. 919.

*apolis,* 232 U. S. 430; *Erie R. Co.* v. *Public Utility Commissioners,* 254 U. S. 394, 409. Compare *Atlantic Coast Line* v. *Goldsboro,* 232 U. S. 548, 554. And in every such case the municipality apparently bore the cost of constructing the new highway for which grade separation was required.[39]

Here were adduced—as tending to show that it was arbitrary and unreasonable to impose upon the Railway one-half the cost of this underpass—not only the revolution wrought by motor vehicle transportation and the creation and purposes of the Federal-aid highway system; but also the local conditions at Lexington; the character of the place where the underpass was ordered built; the extent of the railroad operations there; the character of the existing highway facilities, and of their use at that point; the location of the proposed highway; the occasion for its construction; the use contemplated; the reason why the underpass was ordered; the depletion of the Railway's revenues resulting from the construction of federal-aided highways, particularly in recent years; the necessary effect of this new highway upon its rail traffic and revenues; and the burden of taxation already borne by the Railway as compared with that of the owners of the motor vehicles who will use the new highway. No case involving like conditions has been found in any of the lower federal courts; nor, excepting the case here under review, has any such been found among the decisions of the highest courts of any State.[40]

---

[39] In *Lehigh Valley R. Co.* v. *Commissioners,* 278 U. S. 24, the crossing was over a state highway, which had originally been an " ancient county road laid out in 1811." In *Chicago, M. & St. P. Ry.* v. *Minneapolis,* 232 U. S. 430, the canal and footpath to be crossed were part of a park development.

[40] In the following cases, among others, decided since the Federal-aid Highway Act of 1921, orders of state commissions directing railroads to pay the whole, or part, of the cost of grade separation, on

The Supreme Court of Tennessee did not consider whether in view of the facts relied upon, it was arbitrary and unreasonable to impose upon the Railway one-half the cost of the underpass. It assumed that the state action was valid because it found that the action was taken " to promote the safety of persons traveling the highways at grade crossings as well as to promote the safety of persons traveling the railroads at such crossings by eliminating dangerous grade crossings "; and added: "Admitting the insistence of complainant ·that the primary object of highway construction and the object of federal contribution to highways is to invite and stimulate interstate traffic or travel upon the highways, it does not follow that the State roads are not primarily designed to serve the people of the State."

*Third.* We have· no occasion to consider now whether the facts presented by the Railway were of such persuasiveness ,as to have required the state court to hold

modern state highways, in several instances Federal-aid highways, were unsuccessfully challenged as unconstitutional under the particular circumstances; but in none of them, so far as appears, was the charge of arbitrariness supported on a record embodying facts similar to those presented above. *Chicago, N. S. & M. R. Co.* v. *Illinois Commerce Comm'n,* .354 Ill. 58 (1933); 188 N. E. 177; *Gulf, C. & S. F. Ry.* v. *Louisiana Public Service Comm'n,* 151 La. 635 (1922); 92 So. ·143; *New Orleans ·& Northeastern R.· Co.·* v. *State Highway Comm'n,* 164 Miss. 343 (1932); 144 So. 558; *Chicago, R. I. & P. Ry.* v. *Public Service Comm'n,* 315 Mo. 1108 (1926); 287 S. W. 617; *State ex rel.* v. *Public Service Comm'n,* 297 S. W. 47 (Mo. 1927); *State ex rel.* v. *Public Service Comm'n,* 62 S. W. (2d) 1090 (Mo. 1933); *State ex, rel.* v. *Public Service Comm'n,* 334 Mo. 832; 68 S. W.· (2d) 691 (1933); *State ex rel.* v. *Public Service Comm'n,* 334 Mo. 985, 992, 995, 1001; 70 S. W. (2d) 52, 55, 57, 61 (1934); *State ex rel.* v. *Public Service Comm'n,* 335 Mo. 180; 72 S. W. (2d) 101 (1934); *North. Dakota State. Highway. Comm'n* v. *Great Northern Ry.,* 51 N. D. 680 (1924); 200 N. W. 796; *Chicago, M. & St. P. Ry.· v. Railroad Comm'n,* 187 Wis. 364 (1925); 204 N. W. 606. ..

that the statute and order complained of are arbitrary and unreasonable. That determination should, in the first instance, be made by the Supreme Court of the State. Compare *Sioux City Bridge Co.* v. *Dakota County,* 260 U. S. 441, 447; *Chastleton Corp.* v. *Sinclair,* 264 U. S. 543, 548–9; *Twist* v. *Prairie Oil Co.,* 274 U. S. 684, 692; *Grant* v. *Leach & Co.,* 280 U. S. 351, 363.[41] Moreover, since that court held the facts relied upon to be without legal significance, it did not enquire whether the findings were adequately supported by the evidence introduced in the trial court. The correctness of some of the findings is controverted by the State. Other facts of importance bearing upon the issue may possibly be deducible from the evidence, or be within the judicial knowledge of that court. When the scope of the police power is in question the special knowledge of local conditions possessed by the state tribunals may be of great weight. Compare *Welch* v. *Swasey,* 214 U. S. 91, 105, 106; *Laurel Hill Cemetery* v. *San Francisco,* 216 U. S. 358, 365.

We have also no occasion to consider whether the Railway should bear a proportion of the cost of the underpass less than one-half. The propriety of a lesser charge was not, and could not have been, considered by the Commission; and it was not considered by either of the lower courts. It was conceded by counsel for the State that the only questions now reviewable are the validity of the statute which compelled the State Highway Commission to impose upon the Railway one-half of the cost; and the

---

[41] See too, *McCandless* v. *Furlaud,* 293 U. S. 67; *Missouri ex rel. Wabash Railway* v. *Public Service Comm'n,* 273 U. S. 126, 131; *Hammond* v. *Schappi Bus Line,* 275 U. S. 164, 169–172; *Hammond* v. *Farina Bus Line,* 275 U. S. 173, 174–5; *United States* v. *Brims,* 272 U. S. 549, 553; *Gerdes* v. *Lustgarten,* 266 U. S. 321, 327; *Brown* v. *Fletcher,* 237 U. S. 583, 586–8; *Wilson Cypress Co.* v. *Del Pozo,* 236 U. S. 635, 656–7.

validity of the order made thereunder. Compare *Norwood* v. *Baker*, 172 U. S. 269, 290–4; *Schneider Granite Co.* v. *Gast Realty Co.*, 245 U. S. 288; *Thomas* v. *Kansas City Southern Ry.*, 261 U. S. 481; *Road Imp. Dist. No. 1* v. *Missouri Pacific R. Co.*, 274 U. S. 188; *Rowley* v. *Chicago & Northwestern Ry.*, 293 U. S. 102, 112.

Nor is it necessary to consider the contentions of the Railway that the state action here challenged, taken in conjunction with the burdens of taxation and systems of regulation to which the railroads and their competitors are subject, amounts to a denial of equal protection of the laws; and that it discriminates against, and imposes a burden upon, interstate commerce.

The judgment of the Supreme Court of Tennessee is reversed and the cause is remanded to it for further proceedings not inconsistent with this opinion.

*Reversed.*

MR. JUSTICE STONE and MR. JUSTICE CARDOZO are of the opinion that there is nothing in the evidence or special facts relied on by the appellant to sustain a finding of arbitrary action by the State of Tennessee or its official representatives; that on the contrary the separation of grades is conceded to be necessary to give protection to travelers against perils created by the railroad; that a decision correct in result may not properly be reversed because the reasoning of the opinion is inadequate or erroneous; and that upon the facts stated in the record as well as upon any others within the range of judicial notice the appellant has failed to sustain the burden of establishing a violation of its constitutional immunities, and the decree should be affirmed.

MR. JUSTICE MCREYNOLDS took no part in the consideration or decision of this case.