## MARTIN COUNTY v. FLORIDA EAST COAST RY. CO., et al (No. 2).
### No. 1519.

Circuit Court, Martin County.
February 20, 1963.

Dean Tooker, Stuart, for plaintiff.

John B. L'Engle, St. Augustine, and Sumner & Sumner, Fort Pierce, for defendants.

## C. PFEIFFER TROWBRIDGE, Circuit Judge.

*Order denying motion for rehearing:* This cause came on to be heard January 16, 1963, upon the motion of the defendant, Florida East Coast Railway Company, for rehearing of petitioner's motion to strike certain portions of defendant railway's answer and for reconsideration by the court of its order dated November 30, 1962 [20 Fla. Supp. 156] granting petitioner's motion to strike portions of defendant railway's answer; and the court having heard the argument of counsel for all parties and having considered written briefs submitted to it; it appears that —

The defendant railroad contends that the court erred in its previous order by failing to consider the case of Nashville C. St. L. Ry. v. Walters, 294 U.S. 405, (1935), as substantially overruling the previous case of Chicago B. & Q. R.R. v. Chicago, 166 U.S. 226 (1897). In the 1935 case, the United States Supreme Court considered a Tennessee statute requiring the railroad there to pay one-half of the expense of separating a grade crossing. Mr. Justice Brandeis, delivering the opinion of the court, pointed out that a change in conditions could make a statute which was valid when enacted invalid at a later date. He further concluded that the relative economic positions of the railroad industry and the motor vehicle transportation system had changed since the enactment of the Tennessee statute and that the imposition of one-half the cost of the grade separation *could* be arbitrary and unreasonable. Accordingly, the court returned the case to the Tennessee Supreme Court for its initial determination whether the facts in that case were of such persuasiveness as to have required the state court to hold that the statute and order complained of were arbitrary and unreasonable.

Aside from the fact that the 1935 case does not purport to overrule the 1897 case, there are other distinguishing features which make the 1935 case inapplicable to the instant question. In the 1935 case, the court was concerned with the change of an existing grade crossing to a grade separation. In the instant case we are concerned with the right of the general public to cross the railroad at grade initially. In the 1935 case, the general public already had a means of crossing the railroad and the sole question was whether the railroad must bear the expense of making that crossing more convenient and safer for the motor vehicles upon the road. In the instant case, the general public has no right to cross the railroad and the problem is, if the public is

granted a right to cross at grade level who shall bear the expense of the crossing? In one case it is a question of convenience and in the other a question of necessity.

In the 1935 case, the Supreme Court stated (at page 413) — "The claim of unconstitutionality rests solely upon the special facts here shown." The court further discussed (at page 424) the location of the particular crossing there involved, the amount of existing traffic at that point, the number of trains passing over that crossing, the safety record of the crossing, and other special facts involved in the crossing. The Supreme Court did not, in fact, conclude that the statute was invalid as to that particular crossing but rather remanded the case to the Tennessee Supreme Court which had previously declined to consider the special facts relied upon as showing that the order and statute as applied were arbitrary and unreasonable.

The two Florida decisions cited by the railroad in its brief as adopting the main principles of law in the 1935 case, W. J. Howey Co. v. Williams, 195 So.181 (1940), and Atlantic C.L. R.R. v. Ivey, 5 So.2d 244 (1942), are not in point except insofar as they quote with approval Justice Brandeis' recognition of the change in economic circumstances of railroad and motor vehicle transportation systems.

The remainder of the points of argument cited by the railroad and the cases in support thereof in its brief have been considered by the court but do not appear to affect the only question for decision as set out in the previous order of this court dated November 30, 1962.

For the foregoing reasons, it is ordered and adjudged that the above described motion of the defendant, Florida East Coast Railway, for rehearing and reconsideration by the court of its order dated November 30, 1962, be and the same is hereby denied.

*Order on petition and answer:* This cause came on to be heard December 5, 6, & 7, 1962, upon all issues in the cause to be tried before the court without a jury pursuant to the order of this court entered herein November 27, 1962; and the court having considered the testimony and other evidence, the arguments of counsel, and the briefs submitted; it appears that —

The petitioner, Martin County, brought this condemnation suit against the defendant railroad, F.E.C. Ry. and its mortgagees, to acquire a public easement fifty feet in width to locate a public county road over the railroad's tracks. The railroad (and its mortgagees for whom its counsel also appeared) filed a lengthy

answer to the petition which in substance raised three defenses to the suit which were litigated at the trial — (1) bad faith and gross abuse of discretion by the board of county commissioners in adopting the resolution establishing the crossing and authorizing the suit to acquire it; (2) no public county road was established abutting the crossing on both sides; and (3) such an easement would be an undue and unlawful burden upon intra- and inter-state commerce by the common carrier railroad.

In its brief following trial the railroad argued only the first defense and from statements made at the argument may have abandoned the second defense. Notwithstanding this ambiguity, however, the court is of the opinion that the county affirmatively proved its establishment of a public county road abutting the pro-posed easement on both sides and the railroad neither met the county's proof nor proved otherwise. Further, as to the third defense the court is of the opinion that the evidence fails to show any undue or unlawful burden upon intra- or interstate commerce by the establishment of the proposed crossing. These second and third defenses will not be discussed further.

Although nothing in the petition indicates that the easement sought is to establish the crossing at grade level, both parties have litigated the matter upon the assumption that the crossing would be at grade and the court will so consider it in view of this assumption and of the railroad's repeated statement to the court that it would have no objection to the county road going overhead.

The real meat of this case, which has required more than one year and over six hundred pages of testimony to resolve, is the basic question whether the Martin County board of commissioners acted in bad faith or with gross abuse of discretion in resolving to establish this crossing. At the opening of the trial the railroad conceded that the burden of proof upon these matters rested upon it and it is with such duty in mind that the court will consider the case.

At the outset it is best to make clear what the court cannot do. It cannot determine whether the crossing should be established. That is a power of the board of county commissioners acting in good faith and without gross abuse of discretion. The court can-not determine whether such a crossing will be dangerous. A cir-cuit court has no authority to prohibit dangerous railroad cross-ings per se. How this judge would have voted had he been a mem-ber of the board of county commissioners is not controlling be-cause the decision to be made by that body is not the same as the decision to be made by this court.

The question which this court must determine is whether the board of county commissioners acted in bad faith or with gross abuse of discretion. In reaching this decision the court may consider whether the crossing is dangerous, along with all of the other factors that go into the county's decision, but the court may not substitute its judgment for that of the commissioners.

The court will consider separately the two major contentions of bad faith and gross abuse of discretion —

### Bad Faith

At the trial, the chairman of the board of county commissioners of Martin County appeared and testified with regard to the actions of the county commissioners prior to adopting the resolution establishing the grade crossing and with regard to the reasoning of the board in so acting. Upon cross examination, the railroad brought out that the chairman, Mr. Frank Wacha, is in private life a certified public accountant who has as one of his clients radio station WSTU. While the corporation owning this radio station is not a party to this cause, it is no secret that the crossing will be of great benefit to the radio station and that the closing of the former private crossing at this location caused considerable detriment to the radio station. When Mr. Wacha was questioned regarding the ownership of property by the radio station in the area of the crossing, he asserted the privilege granted by statute to certified public accountants not to disclose the business of a client without the written consent of that client.

The railroad makes much to do about this assertion of privilege and draws numerous inferences from it including the inference that Mr. Wacha may have a property interest in the radio station or may have acted improperly as a county commissioner to benefit this radio station. However, the railroad had ample opportunity to produce records of the office of the secretary of state of Florida concerning the corporation owning the radio station, to depose the officers of the radio station, and to subpoena the corporate books including the stock books of the station. In addition, the president and general manager of the radio station actually appeared upon the witness stand and was subjected to cross examination by the railroad. No questions along these lines were asked of this witness. In fact, the railroad did not even ask Mr. Wacha whether he owned an interest in the radio station, which question certainly would not have been a matter of privilege. With regard to the inference that Mr. Wacha may have acted improperly as a county commissioner, there is no evidence whatsoever to rebut the presumption that an elected official conducted his office in a proper manner. In any event, Mr. Wacha was only one of five county commissioners and there is no showing that his

vote was determinative of the action taken by the board. Accordingly, this court finds that no evidence has been presented to show that Mr. Wacha personally acted improperly in this matter.

While upon the witness stand, the chairman of the board of county commissioners testified that the board's action was taken because an investigation by them disclosed that this particular area was developing rapidly, that it was a desirable area for development, that expensive homes had been built and future plans called for more construction in the area, that a through road connecting the established portion of Alice Avenue to the site of the former private crossing at the radio station was a part of the long range planning of the county, that the radio station performed a fine public service for Martin County and that it was important that access be provided to the station so that this service could be rendered, that the former private crossing had been in existence for many years without any indication that it was a private crossing, and that the county owned public road right-of-way on both sides of the crossing. With regard to the matter of safety, the commissioners compared the proposed crossing with other crossings in the county which they considered more dangerous; the commissioners actually examined the proposed crossing and put their cars on both sides of it to examine the sight distance; they considered the history of safety at the former private crossing; they determined that a crossing was needed for the purpose of getting fire fighting equipment into the area rapidly (particularly in view of a history of fires in this area along the railroad track) and, in general, the crossing was believed by the board to be for the betterment and for the future growth of Martin County. These views of the chairman were corroborated by the certified copies of the minutes of two county commission meetings admitted in evidence as petitioner's exhibits 4 & 5.

Mr. Wacha testified further that the board of county commissioners consulted with their county engineer, a Mr. A. V. Shelton, who had formerly been a long time employee of the state road department in charge of specifications and plans and of the training course for that department. Unfortunately, this engineer died several months prior to the trial of this case and so his testimony was unavailable. The board relied upon this professional engineer for advice in the engineering problems concerning the crossing.

As further evidence of their good faith in enacting the resolution establishing the proposed crossing, the board of county commissioners, prior to the enactment of that resolution, granted a special hearing and meeting at which the railroad appeared and

presented its views. The senior general attorney for the railroad, Mr. John B. L'Engle, one of the attorneys who conducted the trial of this case for the railroad, appeared at this hearing before the board on behalf of the railroad.

From the foregoing, the court concludes that the railroad did not meet the burden of proof to establish that the action of the board was in bad faith. In this regard, it should be noted that the court admitted most of the testimony upon this issue, and the exhibits pertaining to the issue, for the sole purpose of determining whether the board acted in bad faith or in gross abuse of discretion and not for the purpose of proving the truth of the county's arguments concerning the safety of the proposed crossing. The court recognizes that most of this evidence would be inadmissible to prove the question of safety. However, the fact that the board did personally investigate the matter, did consult with a professional engineer, did conduct a special meeting for the purpose of hearing the railroad's views, and did state such reasons for their action in adopting the resolution establishing the proposed crossing, is admissible evidence upon the issues of bad faith and gross abuse of discretion.

### Gross Abuse of Discretion

Basic to the resolution of this issue is a recognition that two opposing philosophies are involved in this matter. The railroad is naturally and understandably concerned primarily with the economical and safe operation of the railroad. The elected commissioners of Martin County are naturally and understandably primarily concerned with the development of the area, the convenience of the public, and the safety of the crossing. Every grade crossing is a detriment to the railroad's aims. Every foot of railroad track which blocks movement, like a wall, is a detriment to the public convenience. The four rails of the main line of the railroad extending over 400 miles from north to south in this state are a barricade to the movement of the public except at those locations where roads go under, over, or cross at grade level. The fewer the grade crossings, the better the operation of the railroad. The more the crossings, the greater the convenience of the public. While viaducts and tunnels solve the problem in theory, their cost is so great that they cannot solve the problem in practice. No matter how desirable it might be, from an economical standpoint all grade crossings cannot presently be eliminated. Each philosophy is understandable and reasonable. Each philosophy is interested in safety. Unfortunately opinions differ as to the safety of the proposed crossing.

It is with regret that the court observes that this case was not litigated in an atmosphere of good will. The railroad, seeing this

as a test case ultimately determining a precedent which will result in savings or expense many times the value of the easement being sought, has thrown the full weight of its organization into the controversy. The board of county commissioners, feeling that the authority of a county of this state has been slighted, has responded with an equal determination to see their official decision carried out. With all due respect to the honor and integrity of the men involved, a personality clash is evident between one of the principals on each side of the controversy.

In this situation, if the court were sitting in judgment of the grade crossing problem for the entire length of the railroad, through the process of bargain and compromise each side probably could be persuaded to give a little and an equitable result could be obtained. However, that is not the case here as only one grade crossing is at issue and this court must decide the fate of that single crossing.

The evidence discloses beyond a doubt that to railroad men all grade crossings are dangerous. Each witness presented by the railroad conceded this point either flatly or in principle. However, since it is obvious in this stage of history that all grade crossings cannot be eliminated, the inherent danger of grade crossings per se cannot be determinative of the issue here.

The railroad presented much expert testimony upon sight distances with relation to time, that is the length of time a motorist at the crossing would have from the time he first saw a train approaching to decide whether to cross and to complete the crossing if begun. The railroad's expert witnesses demonstrated that under existing speed limitations the sight distance time is dangerously inadequate. In fact, the words "critical dangerous crossing" were frequently used. Opposed to this, however, is evidence that the former private crossing was in use for many years without the occurrence of a single accident to the knowledge of the witnesses familiar with the area. The railroad, which might be expected to have the best knowledge of this matter, presented no evidence of any such accident.

In addition, it is readily conceded that as the speed of the train is reduced, the time available for decision and crossing is increased. If this proposed crossing were located in the middle of a lengthy stretch of straight track with no speed limitations in the vicinity, the requirement that trains slow down for the crossing only to speed up again would be more onerous than in the instant case. However, within approximately 4,000 feet from the proposed crossing is a switch to a single track for the St. Lucie River bridge. The railroad's own speed limit across this single track is 20 miles per hour. In response to a question from the

court the railroad's witness, Robert F. Stack, who is railroad foreman of engines and trainmaster and who actually pulled the throttle on freight and passenger trains in this area for over seven years, stated that the maximum loss of time from reducing the speed of trains to 30 miles per hour at the proposed crossing would be two minutes. This maximum would be applicable only to south bound trains as north bound trains would be limited by the length of the train in that the 20 mile per hour existing speed limit at the single track switch would be applicable until the last car had cleared the switch and with the longer trains the engine might already be at the proposed crossing before this occurred.

Whether the reduction of train speed or the increase of sight distance at a crossing affects safety appears to be disputable. The railroad has presented statistics upon the subject but at the same time its own experts have stated that one cannot rate a particular crossing. It has been argued that on the one hand a motorist at a blind crossing will disregard signal devices as he cannot see the train approaching, while on the other hand it has been argued that a motorist at a crossing with visibility sufficient to see a train far off in the distance will disregard such signal devices because of his own judgment that he can beat the train to the crossing. Statistics produced by the railroad show that the use of automatic protection devices does not eliminate the accident problem at grade crossings. However, the railroad's witnesses also testified that these automatic devices could be set so as to give the 30 second warning advocated by its own experts from sight distance time. Other evidence of the railroad discloses that motorists over the 26 month period preceding the trial broke an average of 14 gates per month by driving into them, and over the latter nine months of this period the average was 16 per month showing an increase in this activity. While this demonstrates that even automatic gates do not prevent grade crossing accidents it also appears to the court that a crossing cannot be denied in order to protect a motorist from his own folly in crashing through such gates.

All of this discloses that there is no clear conclusion regarding the safety or danger of the proposed crossing. Fortunately the court is not required to decide this point but must only decide whether the railroad has carried the burden of proof of showing that the board of county commissioners acted with gross abuse of discretion in resolving to establish a public grade crossing at this point. The legislature has given the decision regarding the establishment of such crossings to the elected representatives of the people and not to the officers of the railroad. In this case these representatives of the public have determined that it is in the best interest of the public for this crossing to be established

and in view of the evidence presented to this court there was no gross abuse of discretion in reaching this determination. In deciding that in this particular case the public convenience must prevail over the railroad operation, the board of commissioners has, in their proper discretion, determined that the march of progress in Martin County cannot be slowed to that pace exhibited by railroads over the last 50 years. For the foregoing reasons it is ordered and adjudged that —

(1)   Upon the petition and answer filed herein the court finds for the petitioner in that it has established its right to proceed with the condemnation of the easement sought.

(2)   All matters in controversy between the petitioner and the defendants, save for the amount of damages for the taking, are hereby decided in favor of the petitioner and against the defendants.

(3)   This cause shall proceed to trial by jury upon the issue of damage to the defendants in accordance with the limitations set forth in the order of this court dated November 30, 1962, and the order denying motion for rehearing of that order entered this same date.