CHICAGO AND NORTH WESTERN RAIL-
WAY COMPANY, Appellant
(Defendant below),

v.

W. T. BISHOP, Appellee (Plaintiff below).

No. 3211.

Supreme Court of Wyoming.

April 7, 1964.

Robert R. Rose, Jr., Casper, for appellant.

J. F. Mahoney, of Mahoney & Murphy, Casper, for appellee.

Before PARKER, C. J., and HARNSBERGER, GRAY, and McINTYRE, JJ.

Mr. Justice HARNSBERGER delivered the opinion of the court.

The railroad company appeals from a judgment awarding plaintiff damages for loss of a Shetland pony killed on the railroad company's right of way by one of the company's trains. By admitting the pony came upon the right of way through a hole in its right of way fence, appellant apparently concedes that its fencing was not kept in proper repair. Sections 37–209 and 37–210, W.S.1957, which were first enacted by Ch. 84, S.L. of Wyoming, 1907, and ever since have remained unchanged, are as follows:

Section 37–209:

"All railway corporations, owning or operating a line of railway within the state, shall construct, maintain and keep in repair on each side of the track thereof, a sufficient fence, so connected with suitable cattle guards at all public road crossings as to prevent stock from getting on the railroad track of said corporation, and such fence when of barb wire to consist of four wires securely fastened to posts set not more than thirty-two feet apart, with stays not more than ten feet apart. Such fence shall be constructed within nine months after the completion of any railroad track or any part thereof; provided, that railway corporations shall not be required to construct and maintain a fence within the boundaries of any incorporated city or town."

Section 37–210:

"Any corporation operating a railway and failing to fence the same and to construct and maintain suitable cattle guards as required by the preceding section [§ 37–209], shall be liable to the owner or owners of any live stock killed or injured by reason of its failure to construct or keep in repair such fence or cattle guard in the manner provided in the preceding section, for the full amount of the damage sustained by the owner on account thereof and to make a prima facie case for recovery, it shall only be necessary for such owner to prove the loss or injury to his property; provided, that no corporation operating a railroad shall be liable for any damage occasioned by the wilful act of the owner or of his agent or employees or for stock killed or injured on public road crossings unless negligence on the part of such corporation, its agents, servants or employees can be shown."

Appellant says these statutes make the railroad *absolutely* liable to the owner of livestock which may be killed upon its right of way and concludes that, inasmuch as conditions have changed since these laws were enacted, those statutes are now unconstitutional by reason of what appellant calls "the time honored doctrine" that a statute valid when enacted, may become invalid by change in the condition to which it applies. Appellant cites in support of its theory Nashville, Chattanooga & St. Louis Railway v. Walters, Commissioner of Highways, 294 U.S. 405, 55 S.Ct. 486, 79 L.Ed. 949. In that case the Federal Supreme Court held that a statute valid under one set of facts may be invalid under another set of facts and a statute valid when enacted

may become invalid by change in the conditions to which it is applied. It also held that police power is subject to the constitutional limitation that it may not be exerted arbitrarily or unreasonably. We will not disagree with either of these holdings. However, the factual situation which gave rise to those pronouncements was substantially different from that now before us. In the cited case, a statute empowered a state authority to arrange for the construction of an underpass for a highway which intersected the railroad and required the railroad company to pay one-half the cost of its construction. Because the underpass was a part of a state and nationwide plan to foster motor-vehicle commerce on the public highways and thus afforded motor-carrier competition with the railroad, the court concluded it would be arbitrary and unreasonable to require the railroad to pay one-half of the cost of the facility which was to be used by its competitors.

The case before us is not one which parallels the basic considerations which led to the Nashville, Chattanooga & St. Louis Railway decision. No facility benefiting a competitor of the railroad is required to be constructed and no cost burden for the benefit of a railroad competitor is imposed.

The growing of livestock in Wyoming is one of its most important industries and contributes largely to its favorable economy. It was wholly natural and entirely proper that legislative protection be given this livestock business, and the need for that protection has not been lessened by the advent of a transportation use upon public highways which has grown so greatly as to afford serious competition with the transportation facility previously furnished almost exclusively by railroads. The change which has taken place serves more to emphasize the need for new legislation to protect the livestock grower against the new hazard created by highway transportation rather than the need for nullifying old laws which continue to be necessary in order to protect livestock against the same and identical perils as they were necessary to be pro-

tected against when the criticized laws were first adopted. It might also be observed that these statutes are somewhat in the same pattern as other protective statutes which require the fencing of mine shafts and surface openings. See §§ 30–59(b), (c), and 30–23, W.S.1957.

But appellant says that because trucking upon the public ways now presents a similar hazard to livestock as that occasioned by appellant's operations within its private ways, to require the railroad to continue to give fencing protection to livestock and not to require trucking to give a similar protection, now makes the statutes discriminatory and violates the Wyoming Constitution in several ways, namely, Art. 1, § 6, in that they deprive the railroad of property without due process of law; Art. 1, § 7, in that they exercise an absolute and arbitrary power over the property of railroads; Art. 1, § 2, in that they offend against the equal rights of the railroad to life, liberty, and the pursuit of happiness, and that they transgress U. S. Constitution, amend. XIV, § 1, by denying the railroad the equal protection of our laws.

Before discussing these claims of unconstitutionality, it should be noted that appellant's counsel inaccurately says the questioned statutes make the railroad "absolutely liable" to the owner of any livestock injured, killed, or destroyed by the railroad's trains. Section 37–210, W.S.1957, only imposes liability upon a railroad when livestock is injured or killed by reason of the railroad company's failure to construct or keep in repair the required fencing. Also, the further provision in the statute that proof of loss or injury to the property is sufficient to make a prima facie case for recovery falls short of imposing any absolute liability because the prima facie showing may be rebutted.

Appellant also cites Atlantic Coast Line R. Co. v. Ivey, 148 Fla. 680, 5 So.2d 244, 139 A.L.R. 973, which held Florida's railroad fencing law to be unconstitutional because of the changed conditions brought about by competitive carrier business upon

the public highways. The Florida court held that carriers using public highways and railroads using their own private ways owed like duties; that the hazards on public ways were greater than those on the railroads' private ways; that the purpose of Florida's statutes exercising police power was for the protection against accidents to life and property; that such statutes placed a burden upon railroads which was not imposed upon highway carriers with added double-damage recoveries against railroads, and the court said it was no defense against the charge of unconstitutionality that motor carriers have no authority to fence inasmuch as the legislature had the power to require motor carriers to provide like protection to that demanded from railroads or be subject to penalties. Just how operators of motor vehicles engaged in competitive transportation with railroads are to have apportioned between themselves the expense of fence construction and maintenance and how each of the many such users are to be made responsible for the physical construction, work, and design of the fencing of public highways is left unsolved. To say that highway users may be legislatively required to fence the highway public property or be penalized for not so doing, is, under all circumstances present, quite a novel idea and is obviously wholly impracticable. This decision is, therefore, not at all persuasive. Even counsel for appellant generously calls attention that in Louisville & Nashville Railroad Company v. Stuart, 270 Ala. 285, 117 So.2d 399, a contrary decision was rendered. There the court upheld the State's right to require fencing of a railroad company's right of way even under present conditions. The Alabama court, after noting the sole question presented to it had been considered in Ex parte Hines, 205 Ala. 17, 87 So. 691, 695, where it was said the fencing legislation was a proper exercise of police power enacted for protection of property and benefit of the public and that it did not violate constitutional guaranty of due process and equal protection of law, thereupon refused to depart from that earlier holding.

Louisville & Nashville Railroad Co. v. Faulkner, Ky., 307 S.W.2d 196, is also offered as sustaining appellant's position. Neither the Kentucky statute relied upon nor the commissioner's opinion, which was accepted by the court's majority, with two justices dissenting, indicate there is any similarity between our statutes requiring railroads to fence their rights of way and the statutes of Kentucky. So far as the opinion is concerned, no question of fencing or fence maintenance was considered. The portion of the Kentucky statute quoted merely made the killing or injury of cattle by the engine or cars of any railroad company prima facie evidence of the company's negligence, thus placing the burden of proving freedom from negligence upon the railroad. Additionally, an examination of applicable K.R.S. §§ 256.100–256.170 (1962), dealing with railroad fencing, as well as K.R.S. § 277.330 (1962), quoted in part by the commissioner, shows Kentucky's fencing laws, applicable to railroads, are entirely dissimilar to those of Wyoming. In consequence, the difference between Kentucky's laws and Wyoming's laws leaves little force in the Kentucky decision. Briefly, the major difference lies in that Kentucky does not require railroads to *fence out* livestock, while Wyoming laws do exactly that. This difference bears materially upon discrimination and equal protection of laws, because it requires that consideration be given to the question of acceptable classification.

■ Can it be said that there is not a substantial difference between the condition, position, and duty of a railroad operating its trains within private property owned by it and under its exclusive control, and that of motor carriers using its vehicles upon highways owned, controlled, supervised, and maintained by public authority for the convenience of the public generally? If there is such a difference, would it not justify placing railroads in one category and motor carriers in another classification? Are not there different conditions, where the railroad has ownership, right of possession, and control of the right

of way it uses, and where the motor carrier has no ownership of the highway, has only the right of its transient use, and is without any control over it; where the railroad has exclusive right of use of its right of way, while the motor carrier must share its use of the public highways in common with various other vehicles; where the railroad maintains its own trackage and right of way, while the motor carrier is entirely dependent upon public authority for maintenance and policing of the roadway it uses; where the railroad maintains its right of way for its own exclusive use, but the motor carrier has no control of the maintenance of the public highway and must use it in common with many, varied types of vehicles, many of which are not engaged in competitive transportation with railroads?

Another material difference between these two types of carriers lies in the fact that special privileges and rights which are not enjoyed by motor carriers have been accorded railroads. Railroads have received land grants and other concessions which are not given motor carriers. Railroads have been granted power of eminent domain and motor carriers have not. Railroads are not subjected to the same type of supervision as are motor carriers, and the operations of railroads are not regulated in the same manner as are motor carriers. Railroads are not required to operate under licenses or permits from both State and Federal Government. Also states and the National Government have special laws pertaining only to railroads and not to motor carriers, giving railroad employees special protection. All these differences recognize that railroads are a special class for which there are and should be special laws. These additional distinguishing features and many others are noted in a decision from our sister state of South Dakota in Berens v. Chicago, Milwaukee, St. Paul and Pacific Railroad Company, S.D., 120 N.W.2d 565, where the constitutionality of statutes similar to those here under attack was upheld.

As early as 1919, and before motor carrier transportation came into serious competition with railroad haulage, this State made it unlawful to run domestic stock in public lanes or fenced roads (Ch. 109, S.L. of Wyoming, 1919, amended, now § 11–507, W.S.1957). While this early legislation was probably inspired mostly for protection of users of the public ways, it evidences our lawmakers' alertness to give at least some protection against hazards which accompany use of the public's road, yet, at the same time, special exception from that law was made in favor of range cattle drifting into such public lanes or fenced roads. Later on in 1955, additional legislation, applicable under certain circumstances, was enacted giving further protection for use of public highways, §§ 11–600—11–608, W.S. 1957. Without giving it judicial notice, it is nevertheless obviously a practice indicating the policy of this State's highway department to construct fences along the boundaries of the rights of way as a part of its public road construction. Although this practice seems not to be statutorily required, still only judicial myopia would leave us unaware that through its highway department the State has already launched a program not only for protection of livestock from injury upon its highways, but also for the protection of the highway users. Of course, these facts do not of themselves give answer to charges of discrimination and unequal treatment against the railroads, but they do serve to somewhat point up that the state authority having control of our highways is voluntarily assuming the same fencing obligation which is mandatorily required of railroads by statute. Even so, it is true that neither the State nor its highway department is or could be legislatively made subject to penalty for failure to fence and maintain or to prima facie liability, nor can the State or its highway department be held liable in any event unless immunity is lawfully waived. However, it is just as clear that a user in common with others of a public road over which a motor carrier has no control should not be made responsible for its fencing and maintenance much less be made prima facie responsible for failure to do that which

such motor carrier cannot lawfully be made responsible for doing.

■ Conceding the injury hazard to livestock is as great or even greater upon public highways than it is upon railroad private rights of way, and that the nature of the peril to livestock is identical on both ways, if there is a material and sufficient area of difference between the ownership and control of the ways used, and if there is a difference in the exclusive character of the use by the railroads of their own rights of way as measured against the use of the public highways by motor carriers in common with various other types of vehicular use, then the basis for separate classification would seem to exist and the legislature may impose duties and liabilities upon one class, and fail to impose corresponding duties and liabilities upon the other class, without being in violation of constitutional preclusions of discrimination, inequality, or absence of due process. It is not for us to hold unconstitutional legislative enactments merely because they now fail to give complete protection against a danger. It is for the legislature to find the way to protect against the new hazards, presented by the changed conditions.

■ There are other faces to the matter of discrimination which have not been considered by either counsel. Railroad companies have had and still have the same equal opportunity as motor vehicle owners and operators have had to procure certificates of public necessity and convenience entitling them to the use of public roads and highways for transportation purposes. It is common knowledge that some railroad companies are in fact the possessors of such permissive rights and under them are using the public ways for their own motor-carrier transporting. This equality of opportunity to use public facilities belies the charge that railroads are discriminated against in favor of competitive motor transporters. If railroads have chosen to forego their equal rights and opportunities to use public roads and highways, they have no just complaint because their election to use their own private ways carries with it the statutory obligation to give reasonable protection on those private ways against livestock being injured.

While the State has not as yet by statute required public roads and highways to be fenced, and by that method give protection to livestock on the public roads and highways, the State has provided its roads and highways with policing and patrolling as well as maintenance protection. The adequacy or sufficiency of that protection may be a matter for legislative concern, but it does not amount to legislative discrimination which violates a constitutional prohibition.

It might also be said that practicality plays some part in classification. The legislative exercise of police power to guard against known hazards should not be abrogated where it is impossible or impractical to effectively give full protection against an evil. It is not discriminatory nor is it unequal treatment to afford protection as far as may be given, even though it is impossible or impractical to give complete protection against that evil under every circumstance. Therefore we are not justified in annulling meritorious legislation which gives protection to livestock as far as the legislature has so far found it practical to do. While changing times have created a new peril which indicates need for further legislative consideration, the changes do not, at this time, warrant judicial interference.

The judgment is affirmed.

Affirmed.