MISSISSIPPI PUBLIC SERVICE COMMISSION *v.* I. C. R. R. Co.

No. 40981          February 2, 1959          108 So. 2d 573

*Wade Creekmore,* Asst. Atty. Gen., Jackson, for appellant.

*Byrd, Wise & Smith*, Jackson, for appellees.

Kyle, J.

The appellees, the Illinois Central Railroad Company and the Railway Express Agency, Inc., filed their joint petition with the Mississippi Public Service Commission on February 14, 1957, seeking authority to discontinue their agencies at Lorman in Jefferson County, during the first eight months of each year, and to establish in lieu thereof during that period a prepay station at said point. The petitioners alleged in their petition that the business at the Lorman station had steadily declined during the last several years; that the type of freight, both carload and less than carload shipments, could be handled by the operation of a prepay station without undue burden upon the general public; that the public convenience and necessity no longer required the services of an agent for the full year at said point, and that it would be to the best interest of the general public that the agencies be discontinued, except during the cotton shipping season each year. Protests against the discontinuance of the existing agencies were filed by citizens of the Lorman community, and a hearing was had before the Public Service Commission on August 21, 1957.

It was agreed by all parties at the beginning of the hearing that if the petition of the railroad company was granted, the petition of the express agency would also be granted, and if the petition of the railroad company was denied, the express agency application would also be denied. Three witnesses testified for the railroad company. Four witnesses testified for the protestants, and three other witnesses who were present to testify for the protestants stated to the Commission that the statements made by the other witnesses were substantially correct. At the conclusion of the hearing the Commission took the matter under advisement, and on September 5, 1957, entered an order denying the petition. The Commission made no detailed findings of fact, but merely stated in its order that, from the evidence, the Commission was of the opinion that it was in the public interest that the petition be denied. From that order the petitioners prosecuted an appeal to the Circuit Court of the First Judicial District of Hinds County, and on March 14, 1958, that court entered a judgment reversing the order of the Public Service Commission and authorizing the railroad company and the express agency to discontinue their agencies at Lorman during the first eight months of each year.

The case is now before us on appeal by the Public Service Commission from the above mentioned judgment of the circuit court.

As stated by this Court in the case of Citizens of Stringer v. G. M. & O. R. Co., (1956) 90 So. 2d 25, the paramount questions presented for our decision are (1) whether the public convenience and necessity would be reasonably met by the substitution of a prepay station in lieu of an agency station at Lorman, and (2) whether the finding and order of the Commission to the contrary are supported by substantial evidence or are purely arbitrary and capricious. There is also presented the further question whether the requirement as to public conveni-

ence and necessity is such as to impose upon the appellees the duty of maintaining the agency station even though to do so would result in financial loss to the appellees. The power of a court of competent jurisdiction to review the order of the Commission in a case of this kind, to determine whether it is supported by substantial evidence or is purely arbitrary and capricious, is well settled by the decisions of this Court. Dixie Greyhound Lines, Inc., v. Mississippi Public Service Commission, 190 Miss. 704 200 So. 579, 1 So. 2d 489; Tri-State Transit Co. v. Dixie Greyhound Lines, 197 Miss. 37, 19 So. 2d 441; Citizens of Stringer v. G. M. & O. R. Co., supra.

■■ The rule is also well settled that the findings of the Commission under Section 7815, Code of 1942 Rec., are prima facie correct, and that the reviewing court can not substitute its judgment for that of the Commission where there is a substantial basis in the evidence for such finding. Tri-State Transit Co. v. Dixie Greyhound Lines, Inc., supra; Cobb Bros. Const. Co. v. G. M. & O. R. Co., 213 Miss. 706, 57 So. 2d 570; West Bros., Inc. v. Illinois Central R. Co., 222 Miss. 335, 75 So. 2d 723. ■■ Where the essential facts are not contradicted, the reviewing court may determine as a matter of law whether the same are sufficient to support the order of the Commission.

The record in this case shows that Lorman is an unincorporated community with a population of approximately 200 persons. The village is located in Jefferson County approximately 12½ miles from Port Gibson and 8.4 miles from Fayette. Port Gibson, Lorman and Fayette are all located on U. S. highway No. 61, which is a paved highway. There is no bank or industrial plant located at Lorman. The commercial establishments consist of a general mercantile store, a rural electric power association headquarters and two gasoline filling stations, one of which is a combination service station, bus station and post office. The railroad agent at Lorman handles the business of the express agency. The railroad

company maintains open agencies at Port Gibson and Fayette, and also at Harriston, which is located 7 miles south of Lorman. The company operates a local freight train through Lorman which renders northbound service on Saturday, southbound service on Sunday, and service in both directions on other week days. There is no passenger train service at Lorman. Continental Trailways provides bus transportation for passengers, and Delta Truck Lines and other Truck operators offer freight service at Lorman. The U. S. mail at Lorman is handled by truck.

J. P. Hoff, trainmaster for the Vicksburg district, testified that the railroad company wished to operate the station at Lorman as a prepay station during the first eight months of the year, and as an open station with an agent in charge during the last four months while the cotton crop is being harvested. Hoff explained that a prepay station is a station which has no agent assigned to it. When an agency station has been converted into a prepay station outbound carload shipments are handled in much the same manner as before. The freight train conductor is authorized to sign bills of lading for such shipments, or the shipper may obtain a bill of lading from an adjoining agency and the conductor will then be notified to move the car. In the case of an inbound carload shipment, the car is set out at the usual unloading point and the bill of lading moving with the car goes to a designated agency for handling, and the agency notifies the consignee by telephone or postal notice. As to less than carload lot shipments, Hoff stated that freight consigned to Lorman as a prepay station in less than carload lots would be unloaded in a warehouse and the consignee would be notified by postal card or telephone call. The freight would be left in a locked storage room in the station. Regular customers would be given keys to the storage room, and a key would be left with a reliable merchant or a place of business conveniently

accessible to other customers. Shippers of freight from such station would be permitted to place their shipments in the storage room at any time, and receivers of freight would be able to withdraw the shipments from such storeroom at any time. If a patron desired to ship freight from Lorman on a prepay basis, or to receive freight through Lorman on a collect basis, he might make credit arrangements with the railroad and conduct his business on that basis without the necessity of an agent. Hoff stated that the station agent at Lorman was on duty eight hours each day during a five day week, but the work to be done required only a small amount of time. In Hoff's opinion the public could be adequately served by a prepay station.

A. G. Wellons, supervising agent of the Illinois Central Railroad Company, testified as to the volume of business handled at Lorman for the years 1954, 1955 and 1956, and offered exhibits prepared by the accounting department to support his testimony. According to Wellons' testimony, the total revenue received by the company from business which passed through the Lorman station during the three year period was as follows: For the year 1954, $22,967.83; for the year 1955, $13,264.57; for the year 1956, $12,007.94. Those figures represented the gross freight revenue, express revenue and Western Union revenue. The net freight revenue for the Illinois Central Railroad Company, for the year 1954, amounted to $13,609.64; and the net express revenue amounted to $1,007.81, and the railroad company's part of the Western Union revenue amounted to $24.52; making a total of $14,741.97 for the year 1954. The total net revenue received by the railroad for the year 1955 was $10,101.82, and for the year 1956 the total net revenue received was $8,249.16. The net freight earnings from business which passed through the Lorman station for the year 1955, amounted to $9,096.49; and for the year 1956, $7,319.79. The inbound carload freight traffic for the year 1954

was 71 cars; for the year 1955, 7 cars; for the year 1956, 13 cars. The outbound carload shipments amounted to 166 for the year 1954; 149 for the year 1955; 93 for the year 1956. According to Wellons' exhibits, during the first seven months of 1957, only 33 carload shipments were received at Lorman station, and of that number 28 were received by the State Highway Department. The freight charges on the less than carload shipments received during the same period amounted to only $642.87. The freight on the less than carload outbound shipments from Lorman amounted to only $87.96.

M. A. Sheahan, statistician in the office of the vice-president and comptroller of the railroad company, testified concerning the cost of handling the freight which passed through the Lorman station and the direct expenses incurred in keeping this station open. According to Sheahan's testimony the system's freight operating expenses, rents and taxes, (excluding station freight expenses) amounted to approximately 70% of the system's freight revenues. These expenses are commonly referred to as ''line haul'' expenses. The portion of system revenues received by the company on the business handled at Lorman during the year 1956 was $8,249.16. Since two stations are involved in every freight shipment, each station is entitled to credit for 50% of the revenue received. The revenues assignable to Lorman, including one-half of the freight revenues received from shipments handled at Lorman, plus 100% of other station revenues, during the year 1956, amounted to $4,589.27. Since it cost the railroad 70 cents out of every dollar to move the freight, maintain the roadbed and the cars on which the freight moved, that part of the expenses assignable to Lorman, exclusive of station expenses, amounted to $3,223.50. The direct station expenses at Lorman, including the station agent's salary, amounted to $4,545.84, making the total expenses assignable to Lorman on

business handled at Lorman during the year $7,769.34. According to formula used, the loss incurred on the business handled at Lorman amounted to $3,180.07 for the year 1956.

Several shippers and other interested parties, as we have already stated, testified in opposition to the petition filed by the railroad company. The testimony of each of these witnesses was to the effect that the discontinuance of an agency at Lorman would work an inconvenience and hardship upon the shippers and receivers of freight in the Lorman area, as well as the public in general. Some of the witnesses also testified that the efforts which were being made to encourage industry to locate in that area would be seriously jeopardized by the discontinuance of the agency station for a period of eight months in the year.

The circuit court, after reviewing the evidence, found that there was no justification from a business standpoint for requiring the railroad company to operate the station at Lorman during the first eight months of the year in any manner other than that proposed by the railroad company. In the opinion rendered by him, which appears in the record, the learned circuit judge noted specifically that during the year 1955 only seven carloads of freight were received at the Lorman station, five of which were received by the same consignee; that during the first eight months of 1956 only nine carloads of freight were received, and five of those were carloads of paving materials for the State Highway Department; that during the first seven months of 1957 only 26 carload shipments left Lorman, 25 of which were pulpwood shipments and one a shipment of cotton; and that during that same seven months period there were only 17 less than carload lot outbound shipments, for which the railroad received only $87.96.

The main points argued by the appellant's attorneys as ground for reversal of the judgment of the lower

court are, (1) that the court erred in declining to consider the actual business done at the Lorman station and the revenue derived therefrom; and (2) that the lower court erred in giving undue weight to the testimony relating to shipments handled during various periods of time less than a year. The appellant's attorneys also argue that the indirect or "line haul" expenses allocated to the business handled at Lorman, representing approximately 70% of the freight revenues assignable to Lorman, should not be taken into account in determining whether the station was operating at a loss, for the reason that "line haul" expenses would necessarily be incurred if the station were closed, and that the only expenses chargeable to Lorman should be the direct station expenses at Lorman, which amounted to $4,545.84.

We think the case is controlled by the rule stated by this Court in Citizens of Stringer V. G. M. & O. R. Co., supra. In that case the Court said: "We have no statute which imposes upon a railroad company the absolute duty to maintain an agency station. In the absence of such a statute, the duty of the railroad company, if any, is to maintain an agency station where it is reasonably necessary to do so and where the public convenience requires it." The Court in its opinion in that case then quoted with approval the statement which appears in 74 C. J. S., Railroads, par. 402b, as follows: " 'While it has been said that unless a statute provides otherwise, a railroad has plenary power to determine whether or not it should keep an agent at any station, railroads are ordinarily under a duty to provide and maintain agents at stations, where reasonably necessary. However, such duty, apart from statute, is at most incidental to the railroad's primary and absolute duty of furnishing transportation services, and it is not obligated to maintain an agent at every one of its stations, as at a station where the volume of business is not sufficient reasonably to demand the services of an employee.' "

■■ It clearly appears from the testimony of the witnesses in the case that we have here, that the continuance of the agency station at Lorman would be at a substantial financial loss to the appellees and would result in economic waste. But aside from that, we think the facts developed during the hearing before the Commission clearly show that the maintenance of an agency station at Lorman during the first eight months of the year is not reasonably neccessary, and that the substitution of a prepay station at that point during the first eight months of the year would adequately meet the reasonable requirements of public convenience and necessity. We are of the opinion that there is no substantial basis in the evidence to support the finding and ruling of the commission, and that the judgment of the circuit court was correct and should be affirmed.

Affirmed.

*McGehee, C. J.*, and *Hall, Lee* and *Holmes, JJ.*, concur.