294 So.2d 173 (1974)
MISSISSIPPI PUBLIC SERVICE COMMISSION
v.
ALABAMA GREAT SOUTHERN RAILROAD COMPANY.
No. 47616.
Supreme Court of Mississippi.
May 6, 1974.
William T. Bailey, Lucedale, Bennett E. Smith, Asst. Atty. Gen., Jackson, for appellant.
Tally D. Riddell, Quitman, for appellee.
SUGG, Justice:
This is an appeal by the Public Service Commission from a judgment of the Circuit Court of Hinds County vacating an order of the Commission requiring the Alabama Great Southern Railroad Company to install protective gates at the Central Avenue railroad crossing in Petal.
Three issues are submitted on this appeal: (1) Did the evidence support the finding of the Commission? (2) Is the order requiring the erection of crossing gates an unconstitutional taking of property without due process of law? (3) Did the Commission palpably prejudge the case?
*174 The first issue of whether the evidence supports the finding of the Commission is controlled by well established principles of appellate review of orders of the Commission. Miss. Code Ann. § 77-1-41 (1972) provides that a determination of the Public Service Commission shall be received in all courts as prima facie evidence that such determination was right and proper.
In Tri-State Transit Company v. Dixie Greyhound Lines, 197 Miss. 37, 19 So.2d 441 (1944), the rule for appellate review of Public Service Commission orders was stated as follows:
The findings of fact of the Public Service Commission are prima facie correct, "the reviewing court can not substitute its judgment for that of the Commission and disturb its finding where there is any substantial basis in evidence for such finding or where the ruling of the commission is not capricious or arbitrary." 42 C.J. 692. (197 Miss. at 47, 48, 19 So.2d at 443).
See also Mississippi Public Service Commission v. Alabama Great Southern Railroad Company, 255 So.2d 665 (Miss. 1971) and the cases cited therein approving this rule; Miss. Public Service Com. v. Illinois Central R. Co., 235 Miss. 46, 108 So.2d 573 (1959); Citizens of Stringer v. G.M. & O.R.R. Co., 229 Miss. 1, 90 So.2d 25 (1956); Dixie Greyhound Lines v. Miss. Public Service Commission, 190 Miss. 704, 1 So.2d 489 (1941).
A brief summary of the evidence is necessary to determine if there was substantial evidence to support the order of the Commission. The main line of the railroad crosses Central Avenue, the main thoroughfare of Petal, and the Company maintains red flashing warning lights, crossbuck signs and "Mississippi Law Stop" signs at the crossing.
The main line of the railroad is located on a grade approximately 3 feet higher than Central Avenue to the west and 4 feet higher than Central Avenue to the east. On the east side of the main line approximately 265 feet south of the center line of Central Avenue there is located a building known as Mobil Farm Center with a spur track between the building and the main line. This spur track enters the main line between the building and the Central Avenue crossing. On the west side of the main line concrete blocks are stacked several hundred feet south of the crossing with a spur track located on the west side of the main line south of the stacks of concrete blocks. There is testimony in the record that vision is obstructed to the south by the Farm Products Building, the stacks of concrete blocks and by boxcars that are parked on the spur track between the Mobil Farm Center and the main line. There are no obstructions north of the crossing. The record also shows that when heavy fog is in the area, visibility both north and south of the crossing, is virtually negligible.
In excess of 9,000 motor vehicles cross the main line on Central Avenue daily on which the Company maintains regular freight and passenger service as well as switching operations. Witnesses estimated that the single daily passenger train through Petal enters the crossing at a speed of approximately 70 miles per hour at times and through freight trains pass the crossing at speeds as high as 60 miles per hour. In the last 20 years there have been 12 accidents at the crossing, those accidents resulting in 8 personal injuries and 4 deaths.
The Company produced evidence which contradicted in material particulars testimony of witnesses on the issues of visibility along the tracks during fog conditions and obstruction of motorists' vision by buildings, boxcars and concrete blocks adjacent to the main line of the railroad. A traffic survey taken by railroad employees indicated that approximately 93% of the vehicles crossing the railroad at Central Avenue in a twenty-four hour period failed to stop as required by state law. The Railroad further pointed out that of the 12 accidents *175 at the crossing in the past 20 years, 5 were caused by vehicles colliding with trains already in the crossing.
There is substantial evidence to support the finding of the Public Service Commission that public safety requires the installation of protective gates at the Central Avenue crossing. We therefore hold that the Circuit Court erred in substituting its judgment for that of the Commission.
The Company contends that the order of the Commission is an unconstitutional taking of its property without due process of law. It challenges the constitutionality of Miss. Code Ann. § 77-9-255 (1972)[1] because the statute does not contain a provision for allocation of the cost of installing protective gates at a railroad crossing, and argues that, for this reason, the statute violates the Fourteenth Amendment to the Constitution of the United States and Sections 14 and 17 of Article 3 of the Mississippi Constitution of 1890.[2]
The United States Supreme Court in the case of Erie R. Co. v. Board of Public Utility Commissioners, 254 U.S. 394, 41 S.Ct. 169, 65 L.Ed. 322 (1920) had before it an order of the Board of Public Utility Commissioners of New Jersey directing the Erie Railroad Co. to construct 14 underpasses and 1 overpass where its line crossed streets in the City of Paterson. The railroad company was ordered to bear the entire cost of the change except 10% of the cost at 3 crossings which was to be paid by Public Service Railway Company. Erie Railroad Co. contended, among other things, that the order amounted to taking the Company's property without due process of law.
The Supreme Court, in passing on the case, stated:
Grade crossings call for a necessary adjustment of two conflicting interests  that of the public using the streets and that of the railroads and the public using them. Generically the streets represent the more important interest of the two. There can be no doubt that they did when these railroads were laid out, or that the advent of automobiles has given them an additional claim to consideration. They always are the necessity of the whole public, which the railroads, vital as they are, hardly can be called to the same extent. Being places to which the public is invited, and that it necessarily frequents, the State, in the care of which this interest is and from which, ultimately, the railroads derive their right to occupy the land, has a constitutional right to insist that they shall not be made dangerous to the public, whatever may be the cost to the parties introducing the danger. That is one of the most obvious cases of the police power, or to put the same proposition in another form, the authority of the railroads to project their moving masses across thoroughfares must be taken to be subject to the implied limitation that it may be cut down whenever and so far as the safety of the public requires. It is said that if the same requirement were made for the other grade crossings of the road it *176 would soon be bankrupt. That the States might be so foolish as to kill a goose that lays golden eggs for them, has no bearing on their constitutional rights. If it reasonably can be said that safety requires the change it is for them to say whether they will insist upon it, and neither prospective bankruptcy nor engagement in interstate commerce can take away this fundamental right of the sovereign of the soil. Denver & Rio Grande R.R. Co. v. Denver, 250 U.S. 241, 246, 39 S.Ct. 450, 63 L.Ed. 958, [962]. To engage in interstate commerce the railroad must get on to the land and to get on to it must comply with the conditions imposed by the State for the safety of its citizens. (254 U.S. at 410, 411, 41 S.Ct. at 171, 65 L.Ed. at 333, 334).
In Atchison, Topeka & S.F.R. Co. v. Public Utility Commission, 346 U.S. 346, 74 S.Ct. 92, 98 L.Ed. 51 (1953) the Supreme Court affirmed a decision of the California Supreme Court approving the allocation of cost between the railroad and the city for the expense of enlarging two existing underpasses in the City of Los Angeles and stated:
Rather, in the cases at bar, the improvements were instituted by the State or its subdivisions to meet local transportation needs and further safety and convenience made necessary by the rapid growth of the communities. In such circumstances, this Court has consistently held that in the exercise of the police power, the cost of such improvements may be allocated all to the railroads. (And cases cited). (346 U.S. at 352, 74 S.Ct. at 96, 98 L.Ed. at 60).
The United States Supreme Court in Erie R. Co. and Atchison, Topeka & S.F.R. Co., supra, authorize a state, under its police power, to require railroads to comply with the conditions imposed by the state for the safety of its citizens at the expense of the railroads. In decisions too numerous to mention, it is firmly established that the legislature has the inherent authority as an incident to the police power of the state, subject to constitutional limitations, to prescribe laws and regulations for the purpose of safeguarding the health, safety and morals of the inhabitants of the state and to promote public convenience and general welfare. Miss. Code Ann. § 77-9-255 (1972) does not authorize the Commission to order elimination of grade crossings for the convenience of the public, but deals only with the erection and operation of protective gates for the safety of the motoring public. It is a legitimate exercise of the police power of the state to secure the safety of the public. The fact that the statute does not provide for allocation, between a railroad and a local community, of the cost of installing protective gates at a crossing does not render the statute unconstitutional as a deprivation of property without due process of law. See Southern Pacific Co. v. Corporation Commission, 83 Ariz. 333, 321 P.2d 224 (1958) and cases cited therein, and Union Pacific Railroad Co. v. Hill, 220 Or. 591, 349 P.2d 1090 (1960) and cases cited therein; 44 Am.Jur., Railroads, § 397.
The Company relies on the case of Nashville, C. & St. L.R. Co. v. Walters, 294 U.S. 405, 55 S.Ct. 486, 79 L.Ed. 949 (1935) as authority for its position that the order of the Commission deprives the Company of its property without due process of law in violation of the Fourteenth Amendment to the United States Constitution. The Company urges in support of this argument that the hazard at the grade crossing was not created by it, but by the increase in traffic flow across its tracks. It points out that the tracks were built before the automobile was invented and that conditions at grade crossings generally and the Central Avenue crossing in particular, have changed substantially during the years since Miss. Code Ann. § 77-9-255 (1972) was first enacted in 1892. It further argues that since the motoring public receives the benefit of the installation of protective gates, the public should be required *177 to bear the cost of installing the gates.
Walters recognized that the police power embraces regulations designed to promote public convenience and the general welfare and is not limited merely to the protection of public health, safety and morals. It also recognized that state action imposing upon a railroad the cost of eliminating a dangerous grade crossing at an existing street may be valid although the improvements benefit commercial highway users who make no contribution toward its cost, but noted that in every case in which the Supreme Court had sustained the imposition of the cost against a railroad, the new highway was an incident to the growth and development of the municipality in which it was located.
In Walters, the Tennessee Supreme Court had held that a statute requiring a railroad to pay one-half of the total cost of the separation of grades for the elimination of grade crossings on state highways was constitutional as a valid exercise of the police power of the state; that the court could not consider whether the provisions of the act had been rendered burdensome or unreasonable by changed economic and transportation conditions any more than it could consider changed mental attitudes to determine the constitutionality and enforceability of a statute. The United States Supreme Court stated:
A rule to the contrary is settled by the decision of this Court. A statute valid as to one set of facts may be invalid as to another. A statute valid when enacted may become invalid by change in the conditions to which it is applied. The police power is subject to the constitutional limitation that it may not be exerted arbitrarily or unreasonably. (294 U.S. at 415, 55 S.Ct. at 488, 79 L.Ed. at 955).
Walters does not apply in the instant case for the same reason stated by Justice Minton in Atchison, Topeka & Santa Fe Railway Co. v. Public Utility Commission, supra:
The appellants rely heavily on the Nashville case, supra, but that decision is in accord with the long-established rule which we here follow and which the Commission applied. As this Court said in the Nashville case: "The claim of unconstitutionality rests wholly upon the special facts here shown." 294 U.S. at page 413, 55 S.Ct. [486] at page 487. In that case, the railroad's share of the cost was fixed at 50% by a Tennessee statute and no consideration was given by the Supreme Court of Tennessee as to whether the application of the statutory amount was unreasonable under the special facts advanced. The grade separation ordered in the Nashville case was located in the rural community of Lexington, Tennessee, which had a population in 1910 of 1,497, in 1920 of 1,792, and in 1930 of 1,823. The improvement was not required to meet the transportation needs of Lexington and was being constructed without regard to that community's growth or to considerations of public safety and convenience resulting from such growth. The highway there under improvement was part of the State highway system and the grade was to be removed primarily as part of economic and engineering planning and to qualify the improvement of the highway for federal aid. Other facts offered pointed principally to the state and nation-wide nature of the highway system and the particular highway there involved, the competition afforded railroads by the users of such highways and the effect of such competition on the revenues of the railroads, and the increasing importance of grade separations as a means of assuring rapid movement of motor vehicles rather than as an exclusively safety measure.
As stated by this Court, "[t]he main contention is that to impose upon the railway, under these circumstances, one-half *178 of the cost is action so arbitrary and unreasonable as to deprive it of property without due process of law in violation of the Fourteenth Amendment." 294 U.S. at page 413, 55 S.Ct. [486] at page 487. Thus, the contention of the railroad and the rule recognized by this Court in the Nashville opinion was that there could be an allocation of costs subject to the limitation that they be allocated always with regard to the rule against unreasonableness and arbitrariness. The judgment of the Supreme Court of Tennessee was reversed and the case remanded thereto because that court had refused to consider whether the special facts shown "were of such persuasiveness as to have required the state court to hold that the statute and order complained of are arbitrary and unreasonable. That determination should, in the first instance, be made by the Supreme Court of the State." 294 U.S. pp. 432-433, 55 S.Ct. 486. (346 U.S. at 353, 74 S.Ct. at 96, 98 L.Ed. at 60).
Earlier in this opinion we stated that the order of the Commission finding that the crossing was hazardous was supported by substantial evidence. The finding of the Commission on this question is as follows:
That from all the evidence given at the hearing that the safety of the public requires the installation and maintenance of gates by The Alabama Great Southern Railroad Company (Southern Railway System) at Central Avenue Crossing, also known as Mississippi State Highway #42, in Petal, Forrest County, Mississippi, in that routine traffic, including school buses, young drivers, commercial vehicles and transport trucks use this extremely dangerous and hazardous crossing daily, which dangerous and hazardous crossing is caused by elevation of track, obstruction of view caused by buildings, trucks, railroad cars placed on siding and other objects which are located near the main line of The Alabama Great Southern Railroad Company (Southern Railway System) at Central Avenue Crossing, along with unusual weather conditions, including fog, which makes it difficult to see or hear approaching trains.
The Commission made a specific finding of the facts that made the crossing hazardous. Of course, if no motor vehicles crossed the railroad at the Central Avenue crossing, no hazard would exist. The fact that in excess of 9,000 motor vehicles pass over the railroad daily does not make the order complained of arbitrary or unreasonable, but to the contrary supports the reasonableness of the order.
We turn to the final issue. The circuit court determined that the Public Service Commission had prejudged this case and had conducted the hearings in a high-handed manner. It is apparent from the record that at least one commissioner, from the very outset of the hearings, entertained a bias in favor of the erection of crossing gates at Central Avenue. Although it is the responsibility of the Public Service Commission to regulate railroads in the interest of public safety, it is axiomatic that fact-finding hearings of the Commission must be conducted in a manner consonant with fundamental fairness to all parties. While it is recognized that the Commission, in the discharge of its regulatory responsibilities must, of necessity, conduct an investigation before issuing a show cause order, a hearing on such order requires that such hearing be conducted in an impartial manner. Since the Commission's determination in this case is supported by substantial evidence and is neither arbitrary nor capricious, we will not disturb the order on the basis that the case was prejudged. The decision of the circuit court is therefore reversed.
Reversed and order of the Public Service Commission reinstated.
RODGERS, P.J., and PATTERSON, INZER and WALKER, JJ., concur.
NOTES
[1] It is the duty of a railroad whose track crosses a thoroughfare, whenever the public service commission shall declare the safety of the public to require it, and shall so order, to maintain a gate at the crossing thereof, and to close it during the passage of its engines and cars, and only for a sufficient length of time for that purpose. The commission may prescribe the materials, dimensions, and mode of operation of such gates.
[2] Sec. 14. No person shall be deprived of life, liberty or property, except by due process of law.

Sec. 17. Private property shall not be taken or damaged for public use except on due compensation being first made to the owner or owners thereof, in a manner to be prescribed by law; and whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be public shall be a judicial question, and as such determined without regard to legislative assertion that the use is public.