573 So.2d 1343 (1990)
MISSISSIPPI PUBLIC SERVICE COMMISSION
v.
COLUMBUS & GREENVILLE RAILWAY COMPANY.
No. 07-CC-59223.
Supreme Court of Mississippi.
December 12, 1990.
*1344 Dennis W. Miller, Jackson, for appellant.
J.P. Coleman, Ackerman, for appellee.
Before DAN M. LEE, P.J., and PRATHER and PITTMAN, JJ.
DAN M. LEE, Presiding Justice, for the Court:
This is an appeal from the First Judicial District of the Hinds County Circuit Court sitting as an intermediate court of appeal which reversed an order issued by the Mississippi Public Service Commission [hereinafter commission] determining that the commission lacked jurisdiction in this matter. Finding the circuit court action correct, we affirm.
Pursuant to complaints from area residents and an assessment by the commission's railroad inspector, the commission issued an "ORDER DIRECTING ISSUANCE OF CITATION TO SHOW CAUSE" on December 7, 1984, to the Columbus and Greenville Railway [hereinafter C. & G.]. This order required C. & G. to appear before the commission to show cause why the railway should not be required to make repairs for adequate drainage at the Sapa railroad crossing in Webster County, Mississippi. C. & G. moved *1345 for a dismissal of the order for the reason that the commission was wholly without jurisdiction to issue orders designed to impact flooding of private residences located several hundred feet away from the railroad right-of-way.
The commission entered an order dismissing C. & G.'s motion to dismiss for lack of jurisdiction. Following a hearing before the commission on its citation and show cause order, a "FINAL ORDER" was entered which directed C. & G. to provide the commission and its engineering staff with plans and specifications designed to correct flooding at the Sapa crossing. "Said plans and specifications shall provide for the construction of an open wooden trestle at the Sapa Crossing or for the modification and redesign of a culvert installation with drainage characteristics and capabilities equal to or in excess to those associated with an open wooden trestle structure." C. & G. was ordered to submit its plans and specifications within 60 days of the order subject to final approval by the commission.
C. & G. then filed notice of appeal to the Hinds County Circuit Court. Upon consideration of the record and briefs filed by both parties, the circuit court found that the commission lacked jurisdiction to issue a citation in this matter and that the commission should have granted C. & G.'s motion to dismiss. The case was reversed and remanded to the commission for the appropriate entry of an Order Dismissing the Citation. Hence, the commission filed its appeal to this Court.
The single issue before this Court concerns the territorial limit of the commission's jurisdiction.

I. DID THE MISSISSIPPI PUBLIC SERVICE COMMISSION HAVE SUBJECT MATTER JURISDICTION TO ORDER THE ALTERATION OF DRAINAGE STRUCTURES UNDER A FREIGHT TRAFFIC RAILROAD AS A RESPONSE TO FLOODING THAT OCCURRED ON PRIVATE PROPERTY SITUATED SEVERAL FEET OFF THE RAILROAD RIGHT-OF-WAY?

FACTS
Near the community of Sapa in Webster County, the C. & G. railway runs in a generally east-west direction and crosses a streambed. Prior to September of 1983, the railroad crossing consisted of an open trestle formed from a latticework of wooden supports. At some point around September of 1983, the wooden trestle failed which prompted C. & G. to take some action in order to restore rail service. C. & G. installed two 48-inch (4 ft.) metal culverts in the streambed which were packed in gray fill gravel with the gravel forming the base or foundation for the rails.
The first instance of torrential rainfall and flooding at Sapa occurred on May 19, 1983, two and a half years subsequent to the replacement of the trestle with two 48-inch culverts. From May 18th-22nd, unusually heavy rains caused flooding on the Big Black River, and the West, Mississippi, station recorded the highest point since such records have been kept. There are three homes in the Sapa area which are of interest.[1] The Womack residence received 21 inches of water during the May flood. The Jenkins home flooded with 18-25 inches of water, and the third residence, the Mullen home, had flooding in the utility room. According to the record, the Womack home is located 200 hundred yards from the tracks, and Ms. Jenkins stated that her house was located a distance of 100 hundred feet from Mr. Womack's residence.
As a result of the heavy rains and flooding, the gray fill gravel underneath the railway track washed away leaving the tracks unsupported and hanging in mid air. However, this problem with the gravel wash out was not unique to the Sapa crossing. Mr. James Marvin Strickland, chief engineer for C. & G., testified that there were 19 locations along the system from Greenville to Columbus which experienced major washouts, and rail service on the C. *1346 & G. line came to a complete halt from May 19-27, 1983. Subsequent to the May flood, C. & G. repacked the two 48-inch culverts with gravel and slag in order to restore service on the line.
Approximately seven months later in December of 1983, a second heavy rainfall produced flooding problems. Mr. Womack reported 13-14 inches of water in his home on this second occasion. The Jenkins home had been raised since the first flooding by two rows of cinder blocks, but the house still flooded with four to six inches of water. Only the yard flooded at the Mullen residence on this second occasion. December of 1983 was also a month of unusually heavy rainfall, and there was widespread flooding in the Yazoo, Tombigbee and Big Black River basins. Once again, some of the gravel fill beneath the track washed out at the Sapa crossing leaving the rails suspended in the air. Further, C. & G. testified that on this occasion they also experienced major washouts along the system and reported a total of 39 washouts that occurred in the year 1983 alone. After this second incident of flooding, C. & G. Railway made changes in the drainage capacity at the Sapa crossing. C. & G. installed two 72-inch (6 ft.) metal culverts and left one 48-inch (4 ft.) culvert in place.
The third and final flood occurred on October 22, 1984. The Womack and Jenkins homes received three to six inches of water. The Mullen home did not flood on this third occasion. Government reports contained in the record reveal that very heavy rainfall and widespread flooding was a statewide problem in October of 1984. There were no problems with the gravel washing away and leaving the rails unsupported during the October, 1984 flood.

LAW
Factual findings of the commission are prima facie correct, and the reviewing court can not substitute its judgment for that of the commission and disturb its findings where there is any substantial basis in the evidence for the commission's findings or where the ruling of the commission is not arbitrary or capricious. Loden v. Mississippi Pub. Serv. Comm'n, 279 So.2d 636, 641 (Miss. 1973); Mississippi Pub. Serv. Comm'n v. Alabama Great So. R.R. Co., 255 So.2d 665, 667 (Miss. 1971). Our Constitution does not permit this Court to retry matters de novo on appeal from administrative agencies. Mainstream Sav. & Loan Ass'n v. Washington Fed. Sav. & Loan Ass'n, 325 So.2d 902, 903 (Miss. 1976).
The appeal from an administrative agency is a limited one. This Court will entertain the appeal only to determine whether or not the order of the agency was (1) supported by substantial evidence; (2) arbitrary or capricious; (3) beyond the power of the administrative agency to make; (4) violated some constitutional or statutory right of the complaining party. Mainstream Sav. & Loan Ass'n v. Washington Fed. Sav. & Loan Ass'n, 325 So.2d 902, 903 (Miss. 1976) (citing Mississippi State Tax Comm'n v. Mississippi-Alabama State Fair, 222 So.2d 664 (Miss. 1969); Loftin v. George County Bd. of Educ., 183 So.2d 621 (Miss. 1966); City of Meridian v. Davidson, 211 Miss. 683, 53 So.2d 48 (1951)).
However, administrative agencies have only such powers that are expressly granted to them or those necessarily implied via their grant of authority. Pittman v. Mississippi Pub. Serv. Comm'n, 538 So.2d 367, 373 (Miss. 1989). If the authority of an administrative agency is not found to be expressly granted or necessarily implied, then the agency's decision is void. Farrish Gravel Co., Inc. v. Mississippi State Highway Comm'n, 458 So.2d 1066, 1068 (Miss. 1984). The term "necessarily implied" is somewhat restrictive. "Necessarily implied" refers to a logical necessity and means that no other interpretation is permitted by the words of the instrument construed, and it has been defined as an implication which yields so strong a probability of intent that any intention to the contrary cannot be supposed leaving no room for doubt. Strong v. Bostick, 420 So.2d 1356, 1361 (Miss. 1982) (citing 42 C.J.S. Implication at 405 (1944)). Furthermore, any such power exercised by an administrative *1347 agency must be found within the four corners of the statute under which it operates. Strong v. Bostick, 420 So.2d 1356, 1361 (Miss. 1982); Mississippi Milk Comm'n v. Winn-Dixie, 235 So.2d 684 (Miss. 1970).
The commission's argument in a nutshell is that it has legislative authority to function as a regulator and to act accordingly in the public interest. As a basis for this authority, the commission directs the Court's attention to four statutes which it embraces as its "enabling authority" to issue its order pertaining to flooding at the Sapa crossing. The authority gleaned from these four statutes is the sum and substance of the commission's argument for jurisdiction in this case. First of all, the commission is delegated general oversight and authority to act by §§ 77-9-1 and 77-9-9.
It is the duty of the public service commission to call for information from railroads and other common carriers from time to time, and to make investigations to determine whether the laws are being complied with on their several parts. It is its duty to see that all the laws, civil and penal, whether contained in this chapter or not, affecting railroads and other common carriers, are complied with, and to prosecute all offenders.
Miss. Code Ann. § 77-9-1 (1972).
The public service commission shall require all the necessary information from railroad, express, and sleeping car companies, and shall make such reasonable orders for their supervision and regulation from time to time as to their charges and otherwise as the public interest may require. (emphasis added)
Miss. Code Ann. § 77-9-9 (1972).
With regard to its authority to inspect railroads and order corrective action to unsafe conditions, the commission refers to the following mandates from the legislature.
The commission shall inspect every railroad whenever it shall deem the same necessary, but at least once each year. The results must be entered upon the minutes of the commission and embraced in its reports, and must embrace information as to the condition of the roadbed, bridges, trestles, rolling stock, and depots, and such other facilities and equipment as the commission may deem proper. Whenever the commission shall find any roadbed, trestle, bridge, tunnel, switch, or any part of a railroad track, or any rolling stock in actual use, in an unsafe condition, it shall direct the railroad company to make the necessary repairs. (emphasis added)
Miss. Code Ann. § 77-9-257 (1972).
It is the duty of the public service commission, upon complaint by petition, or whenever it may have knowledge otherwise of any insecure bridge, trestle, tunnel, or roadbed, to inspect the same, and, if necessary, procure the services of a competent engineer to examine the same. After giving notice to the railroad, the commission may declare such bridge, trestle, tunnel, or roadbed unsafe, and make such recommendation to the railroad relative thereto as it may deem proper. After such bridge, trestle, tunnel, or roadbed be declared to be unsafe in the judgment of the commission, and the same be not made safe, and any accident occur arising out of such unsafe condition, then the finding of the commission shall be prima facie evidence in any suit for damages against the railroad of culpable negligence, and will justify punitive damages. The cost of examination by a competent engineer shall be paid as the expenses of the commission are paid, after the allowance of the same by the commission. (emphasis added)
Miss. Code Ann. § 77-9-259 (1972).
The commission uses the term, "unsafe condition," no fewer than ten times throughout its eleven page brief. Yet, the commission does not expand or explain its concern for such unsafe conditions. Significantly, neither does 452 pages of record testimony and exhibits. It was not until the commission's reply brief when a passing reference was made to the safety implications over the wash out of fill gravel beneath the rail tracks.
*1348 The railroad's position is that the statutes which the commission cites confer no jurisdiction to issue an order involving flood control for two or three private residences located entirely off the railroad right-of-way. It will be recalled from the facts that the Womack residence is located 200 hundred yards or 600 hundred feet from the railroad track.
C. & G. argues that the appropriate forum for the affected residents to seek relief exists in either the Circuit or Chancery Court of Webster County. Obviously, a suit for money damages could be pursued in circuit court. See Masonite Corp. v. Windham, 210 Miss. 90, 48 So.2d 622, 625 (1950) (whether riparian landowner impeded flow of water causing damage to neighbor riparian owner was jury question). Additionally, a court of equity can grant the appropriate relief where a damage remedy alone is not enough. Learned v. Hunt, 63 Miss. 373, 376-77 (1885).
In this regard, it is clear from the record that at the time of the hearing in August of 1986, both Mr. Womack and Ms. Jenkins had already filed suit against the railroad in the Circuit Court of Webster County. We also note that this Court recently affirmed a judgment in favor of Ms. Jenkins in the amount of $20,000.00 in her suit against the railroad. Columbus & Greenville Ry. Co. v. Jenkins, 553 So.2d 28-29 (Miss. 1989).
This Court's case law in interpreting similar questions of the commission's reach of jurisdiction is sparse. In Mississippi Pub. Serv. Comm'n v. Alabama Great So. R.R. Co., the railroad was challenging the constitutionality of Miss. Code Ann. § 77-9-255 (1972). Mississippi Pub. Serv. Comm'n v. Alabama Great So. R.R. Co., 294 So.2d 173 (Miss. 1974). This statute authorized the commission to order the railroad to install safety gates at crossings deemed by the commission to be needed. Miss. Code Ann. § 77-9-257 (1972). The railroad objected that the statute did not provide for an allocation of costs for the installation of the gates and raised Fourteenth Amendment Due Process concerns which fell upon deaf ears. Alabama Great So. R.R., 294 So.2d at 173, 175. This Court stated that the statute, "does not authorize the Commission to order elimination of grade crossings for the convenience of the public, but deals only with the erection and operation of protective gates for the safety of the motoring public." Alabama Great So. R.R., 294 So.2d at 176. Thus, public safety with the public's contact with the right-of-way was the statute's aim and not considerations of convenience. This case went on to hold that substantial evidence existed which warranted the commission's order to the railroad to install safety gates at the Petal, Mississippi, crossing. Alabama Great So. R.R., 294 So.2d at 178.
Two years earlier in 1971, the same conflict was litigated between the same parties. This time the commission ordered the installation of the safety gates at the Rogerslacy railroad crossing in Jones County. Mississippi Pub. Serv. Comm'n v. Alabama Great So. R.R. Co., 255 So.2d 665 (Miss. 1971). However, prior to the hearing, the railroad had implemented several safety features designed to decrease the hazard of crossing the tracks, and the question before this Court was whether there was substantial evidence before the commission to support its order. Id. at 666. We ultimately held that there was not sufficient evidence to support the commission's order. Id. at 667.
We are unable to find any evidence presented to justify the commission's decision that the public safety requires safety gates at this crossing... . The commission either ignored or overlooked the uncontradicted corrective measures initiated and maintained by the railroad and apparently based its decision solely upon the conditions existing prior to these adjustments. Its decision was not responsive to the evidence and since it was not, it is arbitrary and unsupported in fact. Under these circumstances it is our opinion that the lower court correctly reversed the order of the Public Service Commission.
The commission has continuing jurisdiction over matters of public safety and should periodically review the condition at Rogerslacy crossing to determine *1349 whether the safety measures are maintained. If it concludes that the corrective measures are not being adequately preserved and the crossing has again become unusually hazardous, it has adequate power to alleviate the condition. There is not presently before us, however, sufficient evidence to support the order of the Mississippi Public Service Commission.
Mississippi Pub. Serv. Comm'n v. Alabama Great So. R.R. Co., 255 So.2d 665, 667 (Miss. 1971).
No one can dispute the commission's authority to inspect and order the railroad to correct unsafe conditions at right-of-way crossings throughout rail service in this state. Clearly, the statutes which the commission cites confer such authority. However, in this instance the commission is attempting to "long arm" its jurisdiction several hundred feet beyond the railroad right-of-way to impact flood control of private residences. No such statute has been cited and none exists to sanction such a reach of jurisdiction.
We hasten to add that one cannot dispute that the condition caused by the wash out of fill gravel beneath the rails during the two earlier floods created a safety risk for which the commission clearly has jurisdiction. Indeed, a potentially hazardous risk existed when a section of the track was left unsupported and suspended in mid air. Any use of the track in this condition would involve an unacceptable risk of derailment and very tragic consequences. Such a risk should have been the proper focus of the commission. However, it clearly was not. This hearing and subsequent order pertained solely to the flooding of private property located several hundred feet from the C. & G. right-of-way. Nothing in the record even suggests that the commission had an interest in the safety considerations of the situation. The most illustrative example of this fact was the opening comments of the commission's special counsel.
Mr. Chairman, the purpose of today's hearing is to determine what action, if any, is appropriate in regard to some flooding that has occurred in an area called Sapa in west Webster County and it is the Staff's belief that the C. & G. Railroad, when they removed a trestle over a stream  a railroad trestle  and replaced that trestle with some culverts that the effect of this action by the railroad was to aggravate flooding in the area north of the railroad tracks and it is our intention to establish that the area in question is low and it is prone to flood on occasion, but that the existence of these culverts there, as opposed to the railroad trestle, will increase the frequency of the flooding and will increase the severity of the flooding when it occurs.
Record at 60.
It was not until the commission filed its reply brief when the safety considerations caused by the wash out of gravel received brief mention making the commission a johnny-come-lately on the public safety concerns mandated by the legislature.
Having noted that the commission has jurisdiction on matters of public safety throughout rail service in this state and having noted that the condition of unsupported, hanging rail lines is such a matter of concern and safety, further inquiry is helpful. It will be recalled that our scope of review requires an examination of the agency's power to make such an order and substantial or sufficient evidence to support the commission's order. Mainstream Sav. & Loan Ass'n v. Washington Fed. Sav. & Loan Ass'n, 325 So.2d 902, 903 (Miss. 1976); Mississippi Pub. Serv. Comm'n v. Alabama Great So. R.R. Co., 255 So.2d 665, 667 (Miss. 1971).
At the time of the commission's hearing and subsequent order, what did the evidence reveal? First of all, the testimony showed that although wash outs of gravel occurred during the May and December 1983 floods, no such wash out occurred after the October 1984 flood. The 1984 flood was subsequent to C. & G.'s installation of two 72-inch culverts to handle the flow of water along with one 48-inch culvert which was left in place. There is nothing in the record to indicate whether or not the higher capacity culverts corrected *1350 the problem with the wash out of gravel. It will also be recalled that the railroad was well aware of the situation. C. & G. was required to repair some 39 similar wash outs in 1983 alone due to severe flooding, and the chief engineer recalled that 19 locations had to be repaired as a consequence of the May flood. The problem was severe enough to halt rail service for several days between Columbus and Greenville.
Thus, based on the facts of this record at the time of the commission's hearing and subsequent order and citation in August of 1986, we find the existence of sufficient evidence supporting the order questionable, even if the hearing had been properly focused on public welfare and safety considerations. However, we hold as a matter of course that the public service commission is without jurisdiction to issue orders designed to impact flooding suffered by private residences situated far beyond the railroad right-of-way.
Accordingly, we affirm the order of the Circuit Court of the First Judicial District of Hinds County reversing the order and citation issued by the commission and remanding the same to the commission with instructions to dismiss the citation and show cause order.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON, PITTMAN and BLASS, JJ., concur.
NOTES
[1] There is some indication that a fourth residence is located in the area, a Sparkman residence, but it was abandoned during the periods of flooding of interest here.